1 COOLEY LLP
KOJI F. FUKUMURA (189719)
2 (kfukumura@cooley.com)
RYAN E. BLAIR (246724)
3 (rblair@cooley.com)
MATTHEW D. MARTINEZ (333932)
4 (mmartinez@cooley.com)
4401 Eastgate Mall
5 San Diego, California 92121-1909
Telephone:  (858) 550 6000
6 Facsimile:   (858) 550-6420

7 JULIE M. VEROFF (310161)
(jveroff@cooley.com)
8 3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
9 Telephone: (415) 693-2000
Facsimile: (415) 693-2222
10
Attorneys for Defendants
11 CD Projekt S.A., Adam Michał Kiciński,
Marcin Iwiński, Piotr Marcin Nielubowicz, and
12 Michał Nowakowski

13
14                 UNITED STATES DISTRICT COURT

15               CENTRAL DISTRICT OF CALIFORNIA

16
17 ANDREW TRAMPE, Individually and     Case No. CV 20-11627 FMO (RAOx)
   On Behalf of All Others Similarly
18 Situated,                           CLASS ACTION

19                 Plaintiffs,         **MEMORANDUM OF POINTS AND**
                                       **AUTHORITIES IN SUPPORT OF**
20       v.                            **DEFENDANTS' MOTION TO DISMISS**
                                       **PLAINTIFFS' CONSOLIDATED CLASS**
21 CD PROJEKT S.A., ADAM MICHAL        **ACTION COMPLAINT FOR VIOLATION**
   KICINSKI, MARCIN IWINSKI,           **OF THE FEDERAL SECURITIES LAWS**
22 PIOTR MARCIN NIELUBOWICZ, and
   MICHAŁ NOWAKOWSKI,
23                                      Date:  November 18, 2021
                 Defendants.           Time:  10:00 a.m.
24                                      Courtroom:  6D
                                       Judge:  Hon. Fernando M. Olguin
25
26                                     **Oral Argument Requested**
27
28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................... 1

II. SUMMARY OF ALLEGATIONS AND JUDICIALLY NOTICEABLE
    FACTS ..................................................................................................... 4

    A.  CD Projekt and the Individual Defendants ........................................ 4

    B.  CD Projekt's Securities in the United States ..................................... 4

    C.  Video Game Development Process ..................................................... 6

    D.  Cyberpunk .......................................................................................... 7

    E.  Cyberpunk's Release Delays .............................................................. 8

    F.  Cyberpunk's Release and Aftermath ................................................ 10

    G.  Litigation .......................................................................................... 11

III. THIS COURT LACKS PERSONAL JURISDICTION OVER
     DEFENDANTS ..................................................................................... 11

    A.  Defendants Are Not Subject to General Jurisdiction ....................... 12

    B.  Defendants Are Not Subject to Specific Jurisdiction ...................... 12

        1.  Plaintiffs Have Not Shown That Defendants Purposefully
           Availed Themselves of the U.S. Securities Market or
           Purposefully Directed Their Activities to the U.S. ................ 13

        2.  Plaintiffs' Claims Do Not "Arise Out of" or "Relate to" Any
           Defendants' Contact with the U.S. ......................................... 16

        3.  Exercising Personal Jurisdiction Over Defendants Would Be
           Unfair and Unreasonable ....................................................... 17

IV. PLAINTIFFS' CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL
    AND DO NOT SATISFY SECTION 10(B)'S "IN CONNECTION"
    REQUIREMENT ................................................................................... 20

    A.  Plaintiffs Failed to Allege a Transaction Within the Territorial Scope
        of the Securities Exchange Act ........................................................ 20

    B.  Plaintiffs Failed to Allege That Defendants' Conduct Was "In
        Connection With" Plaintiffs' Purchase of the Unsponsored ADRs ... 22

V.  THIS ACTION SHOULD BE DISMISSED ON *FORUM NON
    CONVENIENS* GROUNDS ................................................................... 24

VI. PLAINTIFFS' SECTION 10(B) CLAIM FAILS ................................... 26

    A.  Plaintiffs Fail to Plead Falsity with Particularity ............................. 27

**TABLE OF CONTENTS**
**CONTINUED**

PAGE

1. Many of the Challenged Statements Are Demonstrably True 27

2. The Majority of the Challenged Statements Are Inactionable Puffery ........................................................................................28

3. The Challenged Opinion Statements Are Inactionable ..........30

4. The Challenged Forward-Looking Statements Are Inactionable Under the PSLRA's Safe Harbor ..............................................31

B. Plaintiffs Fail to Plead a Strong Inference of Scienter .......................32

1. Plaintiffs Fail to Allege a Plausible Motive ............................33

2. Plaintiffs' Unverified Anonymous Source Allegations Borrowed From News Articles Should be Disregarded..........34

3. Plaintiffs' "Obvious Defects" Theory Fails ............................36

4. Plaintiffs' "Red Flags" Theory Fails.......................................37

5. Plaintiffs' Remaining Theories of Scienter Fail......................38

6. Plaintiffs' Theories of Scienter Fail Under Holistic Examination................................................................................39

VII.  PLAINTIFFS' SECTION 20(A) CLAIM FAILS.........................................40

VIII.  CONCLUSION ..........................................................................................40

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
   994 F.2d 996 (2d Cir. 1993) ..................................................................... 24

*Ambassador Hotel Co. v. Wei-Chuan Inv.*,
   189 F.3d 1017 (9th Cir. 1999) ................................................................. 22

*Amoco Egypt Oil Co. v. Leonis Navigation Co.*,
   1 F.3d 848 (9th Cir. 1993) ....................................................................... 18

*Amur Sp. z.o.o. v. Fedex Corp.*,
   2016 WL 8929287 (W.D. Tenn. Mar. 7, 2016), *aff'd* 684 F. App'x
   554 (6th Cir. Apr. 4, 2017) ...................................................................... 20

*Anderson v. Peregrine Pharms., Inc.*,
   654 F. App'x 281 (9th Cir. 2016) ............................................................. 31

*In re Apple Comput., Inc. Sec. Litig.*,
   243 F. Supp. 2d 1012 (N.D. Cal. 2002) .................................................... 28

*Applestein v. Medivation, Inc.*,
   561 F. App'x 598 (9th Cir. 2014) ............................................................. 35

*In re Aratana Therapeutics Inc. Sec. Litig.*,
   315 F. Supp. 3d 737 (S.D.N.Y. 2018) ...................................................... 28

*Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cty.*,
   480 U.S. 102 (1987) ................................................................................. 18

*BCS Bus. Consulting Servs. Pte. Ltd. v. Baker*,
   2020 WL 3643486 (C.D. Cal. Apr. 17, 2020) .......................................... 25

*Bowen v. Lancaster*,
   2008 WL 1986038 (C.D. Cal. Apr. 30, 2008) .......................................... 14

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ................................................................................. 16

*Church v. Glencore PLC*,
   2020 WL 4382280 (D.N.J. July 31, 2020) ............................................... 24

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

-iii-

**MP&A ISO MOTION TO DISMISS CAC**
**CASE NO. CV 20-11627 FMO (RAOx)**

**TABLE OF AUTHORITIES**
CONTINUED

PAGE(S)

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ................................................................. 30

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008)..................................................... 34

*Core-Vent Corp. v. Nobel Indus. AB*,
11 F.3d 1482, 1490 (9th Cir. 1993)................................................. 19, 20

*Corwin v. Swanson*,
2010 WL 11598013 (C.D. Cal. Apr. 27, 2010)....................................... 16

*Costanzo v. DXC Tech. Co.*,
2020 WL 4284838 (N.D. Cal. July 27, 2020) ........................................ 32

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010)............................................... 28, 31, 32

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................... 26

*Fed. Deposit Ins. Corp. v. Brit.-Am. Ins. Co.*,
828 F.2d 1439 (9th Cir. 1987)................................................................ 18

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
141 S. Ct. 1017 (2021) ...................................................................*passim*

*Gammel v. Hewlett-Packard Co.*,
905 F. Supp. 2d 1052 (C.D. Cal. 2012)................................................. 28

*Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*,
972 F.3d 1101 (9th Cir. 2020)................................................................ 12

*Golub v. Gigamon Inc.*,
994 F.3d 1102 (9th Cir. 2021)................................................................ 30

*Gompper v. Visx, Inc.*,
298 F.3d 893 (9th Cir. 2002).................................................................. 33

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ......................................................................... 12, 17

# TABLE OF AUTHORITIES
## CONTINUED

**PAGE(S)**

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*,
328 F.3d 1122 (9th Cir. 2003) ................................................................. 18

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984) ............................................................................... 14

*Howe v. Goldcorp Invs., Ltd.*,
946 F.2d 944 (1st Cir. 1991) ................................................................. 25

*Ikeda v. Baidu, Inc.*,
2021 WL 1299046 (N.D. Cal. Apr. 7, 2021) ......................................... 30

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) ............................................................................... 11

*Keeton v. Hustler Mag., Inc.*,
465 U.S. 770 (1984) ............................................................................... 11

*Kelly v. Elec. Arts, Inc.*,
2015 WL 1967233 (N.D. Cal. Apr. 30, 2015) ....................................... 29

*Kelly v. Elec. Arts, Inc.*,
71 F. Supp. 3d 1061 (N.D. Cal. 2014).............................................. 28, 29

*Lipton v. PathoGenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ............................................................... 40

*Lueck v. Sundstrand Corp.*,
236 F.3d 1137, 1146 (9th Cir. 2001) ..................................................... 25

*Luna v. Carbonite, Inc.*,
2020 WL 6205786 (D. Mass. Oct. 22, 2020) ........................................ 39

*Marsulex Env't Techs. v. Selip S.P.A.*,
2016 WL 1076530 (M.D. Pa. Mar. 18, 2016) ....................................... 20

*McGovney v. Aerohive Networks, Inc.*,
367 F. Supp. 3d 1038 (N.D. Cal. 2019)................................................. 35

*Morrison v. Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010) ........................................................................... 2, 21

## TABLE OF AUTHORITIES
### CONTINUED

PAGE(S)

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ........................................................................ 27, 33

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018) ................................................................... 30

*nMotion, Inc. v. Env't Tectonics Corp.*,
196 F. Supp. 2d 1051 (D. Or. 2001) ............................................................. 19, 20

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ............................................................................. 26

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) .............................................................................. 26

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ............................................................................................ 30

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) .............................................................................. 26

*Ortiz v. Canopy Growth Corp.*,
2021 WL 1967714 (D.N.J. May 17, 2021) ........................................................ 28

*Pebble Beach Co. v. Caddy*,
453 F.3d 1151 (9th Cir. 2006) ............................................................................. 16

*Pinker v. Roche Holdings Ltd.*,
292 F.3d 361 (3d Cir. 2002) ...................................................................... 5, 6, 15

*In re Pivotal Sec. Litig.*,
2020 WL 4193384 (N.D. Cal. July 21, 2020) ..................................................... 38

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ................................................................. 28, 32, 38

*Prodanova v. H.C. Wainwright & Co., LLC*,
993 F.3d 1097 (9th Cir. 2021) ................................................................... 37, 38

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ................................................................... 27, 34

# TABLE OF AUTHORITIES
## CONTINUED

**PAGE(S)**

*Ronconi v. Larkin*,
 253 F.3d 423 (9th Cir. 2001) ........................................................ 26, 27

*SEC v. Ficeto*,
 2013 WL 1196356 (C.D. Cal. Feb. 7, 2013) .................................... 13

*Santa Fe Indus., Inc. v. Green*,
 430 U.S. 462 (1977) ....................................................................... 37

*Schwarzenegger v. Fred Martin Motor Co.*,
 374 F.3d 797 (9th Cir. 2004) ..................................................... 13, 16

*Sears, Roebuck & Co. v. Sears*
 *plc*, 744 F. Supp. 1297 (D. Del. 1990) ............................................ 15

*In re Silicon Graphics, Inc. Sec. Litig.*,
 183 F.3d 970 (9th Cir. 1999) .......................................................... 32

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Co.*,
 549 U.S. 422 (2007) ....................................................................... 24

*Smith v. NetApp, Inc.*,
 2021 WL 1233354 (N.D. Cal. Feb. 1, 2021) .................................... 28

*Sprewell v. Golden State Warriors*,
 266 F.3d 979 (9th Cir. 2001) .......................................................... 26

*In re Stac Elecs. Sec. Litig.*,
 89 F.3d 1399 (9th Cir. 1996) .......................................................... 26

*Stewart v. Screen Gems-EMI Music, Inc.*,
 81 F. Supp. 3d 938 (N.D. Cal. 2015) ............................................... 12

*STM Grp., Inc. v. Gilat Satellite Networks Ltd.*,
 2011 WL 2940992 (C.D. Cal. July 18, 2011) ................................... 25

*Stoyas v. Toshiba Corp.*,
 424 F. Supp. 3d 821 (C.D. Cal. 2020) ......................................... 21, 24

*Stoyas v. Toshiba Corp.*,
 896 F.3d 933 (9th Cir. 2018) .................................................. *passim*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

## TABLE OF AUTHORITIES
### CONTINUED

PAGE(S)

*Tarasewicz v. Royal Caribbean Cruises Ltd.*,
2015 WL 3970546 (S.D. Fla. June 30, 2015) .................................................... 20

*In re Target Corp. Sec. Litig.*,
955 F.3d 738 (8th Cir. 2020) ................................................................................ 28

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ...................................................... 27, 32, 33, 39

*In re Tesla Motors, Inc. Sec. Litig.*,
671 F. App'x 670 (9th Cir. 2016) ....................................................................... 27

*Tuazon v. R.J. Reynolds Tobacco Co.*,
433 F.3d 1163 (9th Cir. 2006) ......................................................... 19, 24, 25

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
2017 WL 2378369 (C.D. Cal. May 31, 2017) ............................ 14, 15, 17, 19

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) .............................................................. 28

*Vivendi S.A. v. T-Mobile USA, Inc.*,
2008 WL 2345283 (W.D. Wash. June 5, 2008), *aff'd* 586 F.3d 689
(9th Cir. 2009) .......................................................................................................... 20

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab.*,
2017 WL 66281 (N.D. Cal. Jan 4, 2017) ......................................................... 15

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011) ............................................................... 35

*Walden v. Fiore*,
571 U.S. 227 (2014) ............................................................................................... 14

*Windt v. Qwest Commc'ns Int'l, Inc.*,
529 F.3d 183 (3d Cir. 2008) ................................................................................ 25

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ..................................................................... 30, 31

*Wozniak v. Align Tech., Inc.*,
850 F. Supp. 2d 1029 (N.D. Cal. 2012) ........................................................... 28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

-viii-

MP&A ISO MOTION TO DISMISS CAC
CASE NO. CV 20-11627 FMO (RAOx)

# TABLE OF AUTHORITIES
## CONTINUED

**PAGE(S)**

*Zelman v. JDS Uniphase Corp.*,
  376 F. Supp. 2d 956 (N.D. Cal. 2005)..................................................39

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ...............................................26, 35, 39

**Statutes**

15 U.S.C.
  § 77z-2(i)(1)...........................................................................31
  § 78j(b) ..................................................................................22
  § 78u-5 ..................................................................................31
  § 78u–5(c)(1) .........................................................................31

Securities Exchange Act of 1934
  § 10(b)...........................................................................*passim*
  § 20(a)..................................................................................40

**Rules**

Federal Rule of Civil Procedure
  12(b)(2) ............................................................................11, 12
  12(b)(6) ..................................................................................20

**Other Authorities**

Mariola Lemonnier, *Poland: Investor Protection in the Polish Capital
  Market – Selected Issues*, Global Securities Litigation And
  Enforcement 530–34 (Pierre-Henri Conac & Martin Gelter eds.,
  2019) ...............................................................................19, 24

## I.     INTRODUCTION

CD Projekt S.A. ("CD Projekt" or the "Company") is a video game developer headquartered and incorporated in Poland.  In 2012, CD Projekt announced its plan to create its biggest and most complex video game ever: Cyberpunk 2077 ("Cyberpunk").  After several years of development, Cyberpunk became one of the most anticipated video games of 2020.  In early 2020, Cyberpunk was complete, but CD Projekt needed more time to optimize gameplay, fix bugs, and ensure that the game ran smoothly across ***nine*** video-game platforms, including both current and next generation consoles.  At all relevant times, CD Projekt repeatedly warned investors that because Cyberpunk was so vast and complex, it would be impossible to release a bug-free game.  CD Projekt also told investors that gameplay on the current generation consoles would be less sophisticated and slower than on the PC and next generation consoles.  Moreover, in March 2020, finalizing Cyberpunk became even more difficult when CD Projekt employees started working from home because of COVID-19.  On December 10, 2020, CD Projekt released Cyberpunk. The game performed as expected on the PC and the next generation consoles.  But, despite the Company's efforts to test and optimize Cyberpunk, gameplay on the current generation consoles was worse than the Company anticipated.  CD Projekt's stock dropped following Cyberpunk's mixed reception, and litigation predictably followed.

Plaintiffs' Consolidated Class Action Complaint for Violation of the Federal Securities Laws (Dkt. 41, 43-1 ("CAC")) challenges Defendants' pre-release statements reflecting their hopes for Cyberpunk—that the game would be "a top quality product," "playable," and that "the level [of bugs] will be . . . low."  (¶¶ 40, 41, 46.)[1]  Plaintiffs claim these and other statements were false and misleading when

---

[1] All "¶ _" citations are to the CAC.  All "Ex.  " citations are to the Declaration of Julie Veroff, filed concurrently herewith.  All "Def. Decl. at _" citations are to the Declaration of Piotr Marcin Nielubowicz, filed concurrently herewith.  All emphasis is added unless otherwise noted, and all citations and quotation marks are omitted.

made because Defendants allegedly knew that Cyberpunk would perform poorly on the current generation consoles when released.  In so doing—and as a blatant (and impermissible) example of "fraud-by-hindsight"—Plaintiffs rely *exclusively* on (1) Defendants' *post hoc* statements about what they might have done differently regarding Cyberpunk's development, and (2) after-the-fact news articles citing anecdotes from unknown CD Projekt employees who neither were vetted by Plaintiffs nor satisfy the Ninth Circuit's rigorous standard to permit the Court to credit allegations attributable to "confidential witnesses."

The CAC should be dismissed for five reasons.  *First*, the Court lacks personal jurisdiction.  *All* Defendants are located in Poland, and *all* of the alleged misconduct occurred there.  Moreover, Defendants took *no* affirmative action to help establish or promote the securities giving rise to Plaintiffs' claims.  Rather, such securities were *all* created by third parties—*i.e.*, large banks—without Defendants' support or consent.

*Second*, Plaintiffs' claims are impermissibly extraterritorial.  Under *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") does not apply to overwhelmingly foreign transactions, and Plaintiffs have failed to sufficiently allege any domestic transactions here.  Furthermore, the claims fail to satisfy Section 10(b)'s mandate of a causal connection between the fraud and the securities at issue.  Indeed, because Defendants had no involvement in the creation or promotion of the securities Plaintiffs purchased, Plaintiffs cannot allege—not even plausibly—that the purported fraud was "done to induce the purchase at issue."  *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 951 (9th Cir. 2018).

*Third*, should the Court choose not to address the CAC's jurisdictional issues, the Court should exercise its discretion to dismiss the suit under the doctrine of *forum non conveniens* because Poland, not the Central District of California, is the more appropriate forum to adjudicate this dispute.  Defendants are all based in Poland;

most, if not all, of the important evidence and material witnesses are in Poland, as that is where Cyberpunk was developed and the alleged misstatements were made; Poland has a strong interest in resolving disputes involving its own companies and their executives, whereas Plaintiffs have no apparent connection to this District; and Poland provides an adequate alternative forum, as Plaintiffs can bring their securities claims against Defendants there and obtain a remedy if they prevail.

*Fourth*, should the Court reach the CAC's factual allegations, it will find that Plaintiffs fail to plead an actionable statement. Many of the challenged statements—*e.g.*, that Cyberpunk was "complete" and "playable" before it was released—were true. In terms of substance—"[t]he quests, the cutscenes, the skills, and items"—Cyberpunk was complete well before it was released, and Plaintiffs fail to plead facts suggesting that the quirky bugs made Cyberpunk impossible to play or complete.

Furthermore, the bulk of the challenged statements—*e.g.*, "top-quality product," "we believe the game performs great on every platform," and "we believe that the level [of bugs] will be . . . low"—are plainly inactionable puffery and opinions. Critically, Plaintiffs fail to plead any contemporaneous facts that Defendants did not truly hold those opinions when they said them, or that any fact upon which those opinions were based was false.

Finally, the remaining challenged statements were all forward-looking in nature reflecting Defendants' hopes for Cyberpunk—*e.g.*, that "customers [will] receive a top-quality product," and that "the current version . . . will be playable from the beginning." But Defendants never guaranteed Cyberpunk would be bug-free or an instant hit. In fact, Defendants repeatedly warned investors of precisely what Plaintiffs allege occurred—that Cyberpunk, the Company's biggest, most complex game ever, could have "technical glitches," and that COVID-19 may prevent the Company from properly optimizing the game during its final stretch of development.

*Fifth*, Plaintiffs have failed to plead a "cogent" and "compelling" inference of scienter as required by the Private Securities Litigation Reform Act of 1995

("PSLRA").  Indeed, Plaintiffs fail to articulate even a plausible motive.  Nor could they—Cyberpunk was CD Projekt's biggest, most anticipated game in the Company's history—why would CD Projekt release it if it knew the game was "unplayable"?  Plaintiffs also allege no suspicious stock sales—in fact, the Individual Defendants collectively lost hundreds of millions of dollars after CD Projekt's stock dropped in the days following Cyberpunk's release.  Why would Defendants bet on themselves if they knew Cyberpunk would fail?  The much more compelling (and non-culpable) inference is that CD Projekt tested and optimized Cyberpunk until the very last minute, but fell short because it underestimated the time and effort it would take during an unprecedented global pandemic to make a very complex game run smoothly on older, current generation systems.  At most, Plaintiffs' allegations might amount to mismanagement, but not securities fraud.

For all these reasons, the CAC should be dismissed.

## II.   SUMMARY OF ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS

### A.   CD Projekt and the Individual Defendants

CD Projekt was founded in Warsaw, Poland in 1994, and is incorporated and headquartered in Poland.[2] (¶ 26; Exs. A, B.)  Adam Michał Kiciński is the Company's President and Joint CEO.  Marcin Iwiński is its co-founder and Joint CEO.  Piotr Marcin Nielubowicz is its CFO.  And Michał Nowakowski is its Senior Vice President for Business Development (collectively, the "Individual Defendants").  The Individual Defendants, all of whom live and work in Poland, are members of CD Projekt's Management Board.  (¶¶ 11–15; Def. Decl. at 1.)

### B.   CD Projekt's Securities in the United States

CD Projekt has not registered *any* securities on a national securities exchange in the U.S.  Instead, two types of CD Projekt-related securities trade over the counter

---

[2] Plaintiffs incorrectly allege that the Company is incorporated in Delaware.  (¶11.)

in the U.S. on the Pink Open Market:[3]   F shares and unsponsored American Depositary Receipts ("ADRs").  (¶11; Def. Decl. at 2.)

F shares are foreign securities that have been given U.S. ticker symbols by broker-dealers to facilitate trading and reporting.[4]  (Ex. D at 17.)  By creating F shares, broker-dealers enable U.S. investors to see the foreign shares priced in U.S. dollars during regular trading hours.  (*Id*.)  "While trades are executed in U.S. dollars by U.S. broker-dealers, the shares are settled, cleared and custodized in the local market."  (*Id*.)  CD Projekt's F shares trade on the Pink Open Market under the ticker symbol "OTGLF."  (¶ 11.)  Defendants had no role in creating or promoting CD Projekt's F shares.  (Def. Decl. at 3.)

ADRs also allow U.S. investors to invest in foreign companies, and are "one of the preferred methods for trading foreign securities in the United States."  *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3d Cir. 2002).  "An ADR is a negotiable certificate that evidences an ownership in American Depositary Shares . . . which, in turn, represent an interest in the shares of a non-U.S. company that have been deposited with" a foreign branch (called the custodian) or agent of a U.S. depositary bank. (Ex. E at 19.)  "It is similar to a stock certificate representing shares of stock." (*Id*.)  Thus, a U.S. investor who holds an ADR "is not the title owner of the underlying shares" in the foreign company; rather, "the title owner of the underlying shares is either the depositary, the custodian [*i.e.*, the foreign branch], or the agent."  *Pinker*, 292 F.3d at 367.

"ADRs are tradeable in the same manner as any other registered American security."  *Id.*  But one ADR is not necessarily the equivalent of one share in the foreign company; rather, "[a]n ADR may represent the underlying shares on a one-for-one basis, or may represent a fraction of a share or multiple shares."  (Ex. E at

---

[3] An over-the-counter market "is a decentralized market where securities, not listed on major exchanges, are traded directly by a network of dealers."  (Ex. C at 15.)  The Pink Open Market "is the lowest and most speculative tier . . . for the trading of over-the-counter . . . stocks" and "has no disclosure requirements."  (*Id.* at 13–14.)

[4] These ticker symbols always end with the letter "F"—hence the name F shares.

19.)   ADRs are registered with the U.S. Securities and Exchange Commission ("SEC") on Form F-6, which "requires that the registrant disclose important information related to the issuance of the ADR, including the terms of the depositary agreement (if any), material contracts between the depositary and the issuer, and an opinion of counsel regarding the legality of the ADRs." *Pinker*, 292 F.3d at 367.

Critically, "ADRs may be either sponsored or unsponsored." *Id.*  Sponsored ADRs are "established with the active participation of the issuer of the underlying security." *Id.*  "[T]he non-U.S. company enters into an agreement directly with the U.S. depositary bank to arrange for recordkeeping, forwarding of shareholder communications, payment of dividends, and other services." (Ex. E at 19, 20.)  And the foreign company and the depositary bank "jointly file Form F-6 to register the [sponsored] ADRs." *Toshiba*, 896 F.3d at 941 n.8.  By contrast, "[a]n unsponsored ADR is set up without the cooperation of the non-U.S. company." (Ex. E at 20.)  *See Pinker*, 292 F.3d at 367 ("An unsponsored ADR is established with little or no involvement of the issuer of the underlying security.").  The depositary bank files Form F-6 "without [the foreign company's] formal participation." *Toshiba*, 896 F.3d at 941.

CD Projekt's ADRs, which trade under the ticker symbol "OTGLY," are all unsponsored.  (¶ 11; Def. Decl. at 2.)  They were initiated without the Company's permission, and the Company has remained completely uninvolved in their offering and sale.  (Def. Decl. at 2.)  The three depositary banks offering the unsponsored CD Projekt ADRs to investors in the U.S.— Bank of New York Mellon, Deutsche Bank, and Citibank—were not among the Company's largest stockholders during the Class Period (or any other time).  (Exs. F, G, and H; Def. Decl. at 2–3.)

C.    **Video Game Development Process**

Video games have varying levels of compatibility across gaming platforms, consoles, and console generations.  (¶ 24.)  In November 2020, two next generation gaming consoles were released: Sony's PlayStation 5 and Microsoft's Xbox Series

X.  (¶ 23.)  Their predecessors, the seven-year-old PlayStation 4 and Xbox One, are known as the current generation consoles.  (¶¶ 23, 29.)

Developers face a delicate balancing act—complex games must be sophisticated enough to take advantage of the new hardware on PCs and next generation consoles through "backward compatibility,"[5] but also must run smoothly on current generation systems which are often several years old.  (¶¶ 23–24.)

Developing complex video games takes years and involves several stages. Optimization—the process by which developers improve a game's performance and fix glitches across platforms—"is something [developers] usually do at the last moment, when everything else is ready."  (Ex. I at 30.)

### D.    Cyberpunk

In 2012, CD Projekt announced its plan to develop Cyberpunk, "the largest [video game] in [CD Projekt's] history."  (Ex. J at 33.)  Cyberpunk is a massive, open-world video game where players assume the role a character named "V" and are dropped into a fictional, futuristic city.  Players can roam with considerable freedom through Cyberpunk's vast virtual world where their choices shape the story and world around them, all while advancing through the game by completing various quests. (*Id*.)  With a total budget of over $300 million, Cyberpunk is one of the most expensive and complex games in history and involved over 500 developers.  (Ex. K at 38; Ex. L at 42.)

In June 2018, CD Projekt unveiled a cinematic trailer[6] of Cyberpunk at the Electronic Entertaining Expo ("E3"), an annual international trade event for the video game industry.  (¶ 28.)  The Company also released a separate "gameplay demo"[7] which contained an embedded written disclaimer stating: "WORK IN PROGRESS— DOES NOT REPRESENT THE FINAL LOOK OF THE GAME."  The demo also

---

[5] The ability of a video game designed for current generation consoles to be played on next generation consoles as they become available.
[6] This trailer is viewable at https://www.youtube.com/watch?v=8X2kIfS6fb8 and is cinematic only—it contains no footage of actual gameplay.
[7] This demo can be viewed at https://www.youtube.com/watch?v=sjH48Xs-5OA.

contained several disclaimers spoken by the narrator warning that footage seen in the demo was not final and subject to change.

On June 9, 2019, CD Projekt announced that it would release Cyberpunk on April 16, 2020, for the PC and the current generation consoles.  (¶ 29; Ex. M at 46.)  Due to backward compatibility, the current-gen version of Cyberpunk would be playable on the next generation consoles.  (Ex. I at 28.)  A dedicated next generation version of the game will be released sometime in 2021.  (*Id.* at 29.)

### E.    Cyberpunk's Release Delays

On January 16, 2020, CD Projekt delayed Cyberpunk's release date to September 17, 2020.  (¶ 30; Ex. N at 49.)  Although the game was "complete and playable," CD Projekt explained that it "need[ed] more time to finish playtesting, fixing and polishing" because the game "is massive—full of stories, content and places to visit."  (*Id.*)  During a teleconference held later that day, Mr. Kiciński reiterated that "Cyberpunk 2077 is the biggest and most ambitious project [the Company has] ever undertaken."  (Ex. O at 51.)

Just months later, in March 2020, the majority of CD Projekt's employees started working from home due to the COVID-19 pandemic.  (Ex. J at 34.)  The Company warned that the "coronavirus pandemic introduces the risk that certain members of the team may become unable to perform their assigned duties."  (*Id.* at 35.)  The Company also stated that "[p]ostponed releases are a commonplace occurrence in the videogame industry" because "[d]eveloping games is a highly complex, iterative and costly activity, based on creative effort and requiring continuous development and refinement of technological solutions."  (*Id.* at 36.)  The Company further warned of "the likelihood of incorrect estimation of the required workload, [and] delays due to technical issues in the programming layer (*e.g.*, failure to meet quality assurance criteria or technical glitches)."  (*Id.*)

In June 2020, CD Projekt deferred Cyberpunk's launch date to November 19, 2020.  (¶ 31; Ex. P at 54.)  Again, CD Projekt explained that it needed more time to

1  "balance game mechanics and fix a lot of bugs" because of the game's "huge world,"

2  "abundance of content," and "complex systems." (Ex. P at 54.)  But the game itself—

3  "[t]he quests, the cutscenes, the skills and items; all the adventures [the game] has to

4  offer—it[] [was] all there." (*Id.*)  In a teleconference that same day, Mr. Kiciński

5  said "COVID-19 obviously doesn't help in the final phase," which "always requires

6  a lot of energy, a lot of effort—and I assume it's a bit easier to go into this final phase

7  together—from the human perspective." (Ex. Q at 56, 57.)

8       In a September 2020 teleconference, Mr. Kiciński said that working from

9  home was "not a perfect setup for a creative company." (Ex. I at 28.)  He stated that

10  the Company was "very close" and "on track" to releasing Cyberpunk but noted that

11  "[i]t's a huge game." (*Id.* at 29.)  Mr. Kiciński also confirmed that, "thanks to the

12  backward compatibility," the current generation system version of Cyberpunk "will

13  instantly play great on next gen consoles" and provide "higher quality" gameplay

14  than on current generation consoles. (*Id.* at 28, 29.)

15       In early October 2020, Microsoft and Sony gave Cyberpunk their

16  "certification" and the game went "gold," meaning that after testing the game,

17  Microsoft and Sony permitted Cyberpunk to be sold on both their current and next

18  generation consoles. (Ex. R at 60.)

19       Later that month, CD Projekt announced it was again delaying the release of

20  Cyberpunk until December 10, 2020, because it underestimated how much time it

21  would take to test and optimize the game "while working from home." (Ex. S at 63.)

22  The Company explained that "the game [was] ready, [could] be completed, and ha[d]

23  all the content in it" for all systems. (*Id.*)  But the Company decided to further delay

24  Cyberpunk because it needed "additional time" to complete the "final optimization

25  processes"—to weed out the bugs—for the "current gens." (Ex. T at 65.)

26  Importantly, the Company never promised a perfect game.  Instead, the Company

27  repeatedly warned that (1) "preparing [Cyberpunk] for fairly old machines . . .

28  pose[d] certain unique challenges;" (2) "[w]ith such a big game, too many things may

1  have been put together at a late stage;" and (3) "games of such complexity and
2  magnitude always have some bugs upon release." (*Id*. at 66, 67.)

3      In November 2020, CD Projekt reiterated that Cyberpunk had been delayed
4  because of "the complexity of the final stages of optimizing the game's performance
5  on nine distinct platforms spanning two generations of hardware," and "testing the
6  game . . . while the development team remains physically dispersed." (Ex. R at 60.)
7  Nevertheless, Mr. Kiciński "believe[d] the game perform[ed] great on every
8  platform," but the current generation consoles were "[o]f course" performing "a bit
9  lower than on [next gen] consoles."[8] (Ex. V at 72, 74.) Mr. Kiciński also "believe[d]
10  the level of bugs [would] be low enough that they [would] not stand out from the
11  perspective of gamers," but admitted that "[s]uch a big game can't be entirely bug-
12  free." (*Id*. at 73.)

13      **F.**    **Cyberpunk's Release and Aftermath**

14      CD Projekt released Cyberpunk on December 10, 2020, on all platforms (with
15  the game being backwards compatible on the next generation consoles). (¶ 48.) The
16  game was well-received by players using PC, the next generation consoles, and
17  Stadia, Google's streaming gaming platform. (Ex. W at 76.) "[B]ut the initial
18  feedback from those playing it on the oldest last-gen consoles [was] way below [CD
19  Projekt's] expectations." (*Id*.) Though the game was "playable" on current
20  generation systems, bugs made "the experience . . . far from satisfactory for a lot of
21  people" and, as a result, the Company's stock price fell. (*Id*. at 80; ¶ 52.)

22      As CD Projekt explained in a "post-mortem" following Cyberpunk's release,
23  it did not discover those bugs because (1) COVID-19 prevented "external testers
24  [from] test[ing] the game from homes" and there was an external tester shortage; (2)

25

26  _____

[8] Gaming journalists agreed, with the Company noting that their "[p]ositive impressions . . . underscore the complexity and amazing ambience of [the game],
27  make us very happy, and confirm the remarkable potential of Cyberpunk." (Ex. U at 70.) Those journalists did not review Cyberpunk on current generation consoles
28  because it was being optimized for those consoles "until the very last moment." (Ex. W at 79.)

the Company misjudged how long it would take to optimize the current generation consoles—it was "updating the game on last-gen consoles until the very last minute and . . . thought [it would] make it in time"; (3) the Company underestimated "the scale and complexity of the issues"; and (4) the Company devoted more resources to the "PC and next-gen performance." (*Id.* at 76–79.)[9]

### G.   Litigation

The CAC alleges that Defendants committed securities fraud in violation of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. Plaintiffs claim that Defendants knew, but failed to disclose, that Cyberpunk was not playable on the current generation consoles, which rendered their positive pre-release statements about Cyberpunk false and misleading.

## III.   THIS   COURT   LACKS   PERSONAL   JURISDICTION   OVER DEFENDANTS

As an initial matter, Plaintiffs have not established that Defendants are subject to either general (all-purpose) or specific (case-linked) jurisdiction. The Court therefore should dismiss this action under Federal Rule of Civil Procedure 12(b)(2).

The Due Process Clause limits a court's authority to exercise personal jurisdiction over a foreign defendant to only those instances where the foreign defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (observing that *International Shoe* remains "[t]he canonical decision in this area"). "Each defendant's contacts with the forum State must be assessed individually," *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984), and "[t]he plaintiff bears the burden of demonstrating that

---

[9] On December 18, 2020, Sony stated that it would be removing Cyberpunk from the PlayStation Store and offering gamers full refunds. (¶ 53.) Microsoft also offered refunds but permitted Cyberpunk to remain in the Xbox Store for purchase with a warning that users may experience performance issues. (¶ 57.)

personal jurisdiction is proper," *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020).  Plaintiffs have not met—and cannot meet—this burden, as Defendants are all residents of Poland who had no involvement whatsoever with the creation or promotion of any of the CD Projekt securities traded in U.S. markets.

### A.  Defendants Are Not Subject to General Jurisdiction

To start, Plaintiffs have not established that Defendants are subject to general jurisdiction in this forum.  A court may exercise general jurisdiction to hear "any and all claims" against a foreign defendant only when that defendant's contacts with the forum "are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  An individual is "at home" and therefore "subject to general jurisdiction in her place of domicile." *Ford Motor Co.*, 141 S. Ct. at 1024.  Similarly, the paradigmatic bases for general jurisdiction over a corporation are the place of incorporation and principal place of business. *Id.*

Defendants plainly are not "at home" in the U.S.  Each Individual Defendant is a Polish citizen who lives and works in Poland, and CD Projekt is incorporated and headquartered in Poland.  (Def. Decl. at 1.)[10]  They therefore are not subject to general jurisdiction here.

### B.  Defendants Are Not Subject to Specific Jurisdiction

Nor have Plaintiffs established that each of the Defendants is subject to specific jurisdiction.  "[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear*, 564 U.S. at 919.  "The contacts needed for this kind of jurisdiction . . . *must be the defendant's own choice*" and "[t]he plaintiff's claims . . . must arise out

---

[10] "When adjudicating a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(2), a court may consider extrinsic evidence—that is, materials outside of the pleadings, including affidavits submitted by the parties." *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 951 (N.D. Cal. 2015).

of or relate to ***the defendant's*** contacts with the forum." *Ford Motor*, 141 S. Ct. at 1024–25.  That is so because the core premise of specific jurisdiction is "reciprocity between a defendant and a State: When (***but only when***) a company 'exercises the privilege of conducting activities within a state' . . . the State may hold the company to account for related misconduct." *Id.*

The Ninth Circuit uses "a three-prong test for analyzing a claim of specific personal jurisdiction."  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  First, the foreign defendant "must purposefully direct his activities or consummate some transaction with the forum or resident" or "perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws." *Id.* Second, "the claim must be one which arises out of or relates to the defendant's forum-related activities." *Id.*  And third, "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Id.*  The plaintiff bears the burden of establishing the first two prongs.  *Id.*  If he or she does so, the burden shifts to the defendant to show the third prong.  *Id.*

Here, Plaintiffs have not shown the first two prongs.  But even if they had, exercising jurisdiction over Defendants in this case—who had no involvement whatsoever in the creation of the securities at issue here—would be deeply unfair and inappropriate.

### 1. Plaintiffs Have Not Shown That Defendants Purposefully Availed Themselves of the U.S. Securities Market or Purposefully Directed Their Activities to the U.S.

In a securities fraud case, "minimum contacts may be established either by purposeful direction or purposeful availment." *SEC v. Ficeto*, 2013 WL 1196356, at *4 (C.D. Cal. Feb. 7, 2013).  "[T]he transactional aspects of a securities case may establish purposeful availment" and "[t]he fraud aspects . . . may establish purposeful direction." *Id.*  Plaintiffs have established neither.

***No Purposeful Availment.***  "For purposes of securities fraud, defendants

1   purposefully avail[] themselves of the forum by taking advantage of this nation's

2   laws and its capital markets." *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,

3   2017 WL 2378369, at *7 (C.D. Cal. May 31, 2017).  Defendants plainly have not

4   done so.

5       Plaintiffs offer only the assertion that Defendants "directly or indirectly[] used

6   the means and instrumentalities of interstate commerce, including but not limited to,

7   the [U.S.] mail, interstate telephone communications and the facilities of the national

8   securities exchange."  (¶ 6).  But "the mere use of interstate mail, telephone or wire

9   services is itself insufficient to support assertion of personal jurisdiction."  *Bowen v.*

10  *Lancaster*, 2008 WL 1986036, at *4 (C.D. Cal. Apr. 30, 2008).

11      Moreover, the unsponsored ADRs and/or F shares Plaintiffs purchased do not

12  come close to constituting purposeful availment, as those securities were unilaterally

13  created by third parties without Defendants' involvement.  As noted above, foreign

14  companies do not create or register F shares or unsponsored ADRs.  Rather, they are

15  created by third parties—broker-dealers (in the case of F shares) and depositary banks

16  (in the case of unsponsored ADRs).  The Due Process Clause, however, requires that

17  the contacts "be ***the defendant's*** own choice."  *Ford Motor Co.*, 141 S. Ct. at 1025;

18  *see also Walden v. Fiore*, 571 U.S. 227, 284 (2014) ("[T]he relationship must arise

19  out of contacts that the defendant ***himself*** creates with the forum State.").  "Such

20  unilateral activity of another party or a third person is not an appropriate

21  consideration when determining whether a defendant has sufficient contacts with a

22  forum State to justify an assertion of jurisdiction."  *Helicopteros Nacionales de*

23  *Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984).  Thus, the mere fact that these

24  securities trade on the Pink Open Market in the U.S. cannot be the basis for specific

25  jurisdiction in a securities class action.

26      Indeed, Defendants are unaware of any case holding that F shares or

27  unsponsored ADRs provide a basis for jurisdiction.  And at least one court has held

28  that a foreign company's unsponsored ADRs did not create a sufficient link with a

1   U.S. forum for jurisdiction to attach, even though that company had "authorized"

2   their issuance. *See Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1300–02

3   (D. Del. 1990) (declining to exercise specific jurisdiction over a foreign company

4   that "authorized" unsponsored ADRs because it "neither promote[d] the trading of

5   the ADRs in this country, nor ma[de] the necessary filings with the SEC," and so

6   "[t]he entire program, except for the foreign issuer's supplying basic financial

7   information, [wa]s administered by the United States depository," meaning the

8   defendant had not "done any act" in the forum "with relation to the sale of ADRs").

9       By contrast, several courts have held that a foreign company's ***sponsored***

10  ADRs created a basis for jurisdiction.  In so holding, those opinions emphasized the

11  affirmative, active role of the foreign company vis-à-vis U.S. investors inherent in

12  sponsored ADRs—a role that is decidedly ***not*** a feature of unsponsored ADRs.  *See*

13  *Pinker*, 292 F.3d at 371 ("By sponsoring an ADR, . . . Roche took affirmative steps

14  purposefully directed at the American investing public . . . .  Roche's sponsorship

15  amounted to an active marketing of its equity interests to American investors.");

16  *Vancouver*, 2017 WL 2378369, at *8 ("Daimler AG actively and voluntarily

17  contracted with an American depository bank to sell ADRs to American investors,"

18  "registered its ADRs with the SEC," and marketed those ADRs directly to U.S.

19  investors."); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab.*,

20  2017 WL 66281, at *6, 21–22 (N.D. Cal. Jan 4, 2017) (similar).

21      For these reasons, exercising specific jurisdiction over foreign defendants in a

22  securities class action is inconsistent with due process when the only securities at

23  issue are F shares and unsponsored ADRs.  But even if the Court preferred not to

24  make that categorical determination, exercising jurisdiction is certainly inconsistent

25  with due process here, where Plaintiffs have not alleged (and cannot allege) that

26  Defendants helped, encouraged, or consented to creating the unsponsored ADRs and

27  F shares giving rise to Plaintiffs' claims.  That CD Projekt shares now trade on U.S.

28  over-the-counter markets as F shares and unsponsored ADRs is wholly the

responsibility of third parties.  (Def. Decl. at 2–3.)  Even after learning of the unsponsored ADRs, Defendants have not played any role in encouraging the program's development or liaising with holders of unsponsored ADRs.  (*Id*.)  Plainly, Defendants have not purposefully availed themselves of the U.S.'s capital markets.

***No Purposeful Direction.***   Purposeful direction requires showing that a defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803.  Plaintiffs also cannot make this showing.

First, Defendants are not connected in any way to the securities or transactions alleged to have caused injury to Plaintiffs.  As described above, Defendants took no act expressly aimed at creating the unsponsored ADRs or F shares.

Second, the CAC does not connect any alleged misstatement or omission to the U.S.  Plaintiffs cite statements, annual reports, press releases, and conference calls (¶¶ 39–46), but none is alleged to have originated in the U.S. or to have been specifically targeted at U.S. investors.  *See, e.g.*, *Corwin v. Swanson*, 2010 WL 11598013, at *3 (C.D. Cal. Apr. 27, 2010) ("Statements directed at the general investing public, as Plaintiffs allege these statements were, do not normally constitute conduct that is 'expressly aimed' at a particular forum."); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (holding that the "foreseeability of causing ***injury*** in another State . . . is not a sufficient benchmark for exercising personal jurisdiction."); *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1156–57 (9th Cir. 2006) (explaining that specific jurisdiction requires "something more" than a "foreign act with foreseeable effects in the forum state").

### 2.   Plaintiffs' Claims Do Not "Arise Out of" or "Relate to" Any Defendants' Contact with the U.S.

Plaintiffs also have not satisfied the second prong of the specific-jurisdiction test, *i.e.*, that the claims "arise[] out of or relate[] to the defendant's forum-related activities."  *Schwarzenegger*, 374 F.3d at 802.  Satisfying this test requires "an

affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919.  This requirement "incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Ford Motor Co.*, 141 S. Ct. at 1026.

Here, the controversy centers on the claimed impact of Defendants' allegedly false and misleading statements on the price of Plaintiffs' F shares and unsponsored ADRs.  But Plaintiffs have not shown any meaningful connection between that controversy and this forum.  Defendants' statements were neither made in this forum nor expressly targeted at U.S. investors, and Defendants did not create nor have any involvement with Plaintiffs' securities.  Plaintiffs' claims therefore do not "arise out of" or "relate" to Defendants' contact with this forum.

### 3. Exercising Personal Jurisdiction Over Defendants Would Be Unfair and Unreasonable

Having failed to show either of the first two prongs of the specific jurisdiction test, the Court need not consider the unfairness of exercising personal jurisdiction over Defendants in this case.  But even if the Court did so, subjecting Defendants to jurisdiction in this case would be unfair and unreasonable.

Courts consider seven factors when assessing reasonableness, none of which are dispositive:

> (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Vancouver*, 2017 WL 2378369, at *9.  These factors overwhelmingly cut against the exercise of jurisdiction here.

First, Defendants had no purposeful interjection into the U.S.'s affairs.  CD Projekt is incorporated and headquartered in Poland, the Individual Defendants live

and work in Poland, Cyberpunk was developed in Poland, all the challenged statements were made in Poland, and the only market Defendants chose to sell CD Projekt securities in is in Poland.  (Def. Decl. at 1.)  The Company's trading presence in the U.S. was established by third parties who created the securities at issue here without Defendants' consent.  (*Id*. at 2–3.)  At most, the only connection to the U.S. that Plaintiffs allege is that CD Projekt unveiled a trailer for Cyberpunk at E3, the largest international gaming exposition held in Los Angeles in 2018.  (¶ 28).  But the Supreme Court has "long" been clear that "isolated or sporadic transactions" should be treated "differently from continuous ones" for purposes of assessing specific jurisdiction.  *Ford Motor Co.*, 141 S. Ct. at 1028 n.4.

Second, "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing . . . reasonableness." *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 114 (1987). Here, defending in this forum will significantly burden Defendants, all of whom reside in Poland.  Most (if not all) material witnesses—namely, the Individual Defendants and CD Projekt's current and former employees—likewise are in Poland, as is the documentary evidence, given that Poland is where the challenged statements were made.  *See Fed. Deposit Ins. Corp. v. Brit.-Am. Ins. Co.*, 828 F.2d 1439, 1444 (9th Cir. 1987) ("In a case such as this, in which the defendant has done little to reach out to the forum state, the burden of defending itself in a foreign forum militates against exercising jurisdiction.").

Third, "[w]here, as here, the defendant is from a foreign nation rather than another state, the sovereignty barrier is high and undermines the reasonableness of personal jurisdiction."  *Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 852 (9th Cir. 1993); *see also Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1133 (9th Cir. 2003) ("Litigation against an alien defendant creates a higher jurisdictional barrier than litigation against a citizen from a sister state because important sovereignty concerns exist.").  Indeed, this litigation impacts Poland's

sovereignty because CD Projekt is incorporated and headquartered in Poland, and "Poland's sovereign interest in regulating and protecting such corporations is implicated when a Polish corporation is sued abroad." *nMotion, Inc. v. Env't Tectonics Corp.*, 196 F. Supp. 2d 1051, 1061 (D. Or. 2001).

Fourth, although the U.S. "has a clear and obvious domestic interest in protecting U.S. investors" and "enforcing federal securities laws," *Vancouver*, 2017 WL 2378369, at *10, that interest is diminished where CD Projekt is not incorporated or headquartered in the U.S., none of the alleged misstatements were made here, and Defendants had no role in creating the securities giving rise to Plaintiffs' claims.

Fifth, because most, if not all, the evidence and witnesses are in Poland, this controversy is more efficiently resolved there. *See Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1176 (9th Cir. 2006) ("The site . . . where evidence is located usually will be the most efficient forum."); *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1489 (9th Cir. 1993) ("In evaluating this factor, we have looked primarily at where the witnesses and the evidence are likely to be located."). Should this case proceed in the U.S., discovery requests may be subject to the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters, a difficult and expensive process.[11]

Sixth, "[a] mere preference on the part of the plaintiff for its home forum does not affect the balancing" test. *Core-Vent*, 11 F.3d at 1490.

And seventh, Poland is a suitable alternative forum where Plaintiffs can bring securities claims against Defendants. *See* Mariola Lemonnier, *Poland: Investor Protection in the Polish Capital Market – Selected Issues*, Global Securities Litigation and Enforcement 530–34 (Pierre-Henri Conac & Martin Gelter eds., 2019) (explaining that shareholders in Poland may seek damages against a public company for losses suffered because of misstatements or omissions, and may do so through

---

[11] *See* 18 March 1970, 23 U.S.T. § 2555, T.I.A.S. No. 7444, https://assets.hcch.net/docs/dfed98c0-6749-42d2-a9be-3d41597734f1.pdf.

class actions).  Indeed, courts have held Poland to be an adequate alternative forum for a wide range of tort and contract claims.  *See Marsulex Env't Techs. v. Selip S.P.A.*, 2016 WL 1076530, at \*3 (M.D. Pa. Mar. 18, 2016) (breach of contract and related claims); *Amur Sp. z.o.o. v. Fedex Corp.*, 2016 WL 8929287, at \*6 (W.D. Tenn. Mar. 7, 2016), *aff'd* 684 Fed. App'x 554 (6th Cir. 2017) (tortious interference with contract and related business claims); *Tarasewicz v. Royal Caribbean Cruises Ltd.*, 2015 WL 3970546 , at \*16 (S.D. Fla. June 30, 2015) (negligence and other claims related to workplace conditions); *Vivendi S.A. v. T-Mobile USA, Inc.*, 2008 WL 2345283 at \*15 (W.D. Wash. June 5, 2008), *aff'd* 586 F.3d 689 (9th Cir. 2009) (RICO and common law fraud); *nMotion*, 196 F. Supp. 2d at 1062 (quasi contract and unjust enrichment).  "The plaintiff bears the burden of proving the unavailability of an alternative forum," and Plaintiffs have not shown their claims cannot effectively be remedied there.  *Core-Vent*, 11 F.3d at 1490.

Because the Court's exercise of jurisdiction in this case would be unfair and unreasonable, the Court should dismiss this action for lack of personal jurisdiction.

## IV.   PLAINTIFFS' CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL AND DO NOT SATISFY SECTION 10(B)'S "IN CONNECTION" REQUIREMENT

As separate and independent grounds for dismissal, Plaintiffs have failed to allege a domestic transaction under the Exchange Act, and failed to allege that Defendants' conduct was "in connection with" Plaintiffs' purchase of unsponsored ADRs and/or F shares.

### A.   Plaintiffs Failed to Allege a Transaction Within the Territorial Scope of the Securities Exchange Act

Plaintiffs' claims are impermissibly extraterritorial, requiring dismissal under Federal Rule of Civil Procedure 12(b)(6).  Section 10(b) of the Exchange Act applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  *Morrison*, 561 U.S. at 266–67.  The unsponsored ADRs and F shares at issue here trade on the Pink Open Market, an over-the-counter

market.  (¶ 11).  Because over-the-counter markets are not "exchanges" under the Exchange Act, Plaintiffs must sufficiently allege a domestic transaction to state a claim.  *See Toshiba*, 896 F.3d at 945–46.  They have not done so.

To determine whether a transaction was "domestic" and therefore within the territorial scope of the Exchange Act, courts use the "irrevocable liability" test, which asks whether "the purchaser incurred irrevocable liability within the United States to take and pay for a security" or "the seller incurred irrevocable liability within the United States to deliver a security." *Id.* at 948–49.  In making that determination, courts consider "factual allegations concerning contract formation, placement of purchase orders, passing of title, and the exchange of money," *id.* at 949—*e.g.*, "[a]llegations regarding the location of the broker, the tasks carried out by the broker, the placement of the purchase order, the passing of title, and the payment made," *Stoyas v. Toshiba Corp.*, 424 F. Supp. 3d 821, 827 (C.D. Cal. 2020).  In *Toshiba*, for example, the plaintiffs alleged the number of shares they purchased through unsponsored ADRs; the entity that directed the purchase and where they were located (New York); the broker through whom the buy order was placed and where they were located (New York); how the purchase order and trade confirmation were routed (through OTC Link's servers); and where the depositary bank issued the ADRs, the plaintiffs made the payment, and a transfer of title was recorded (all New York). *Id.* at 826.  Based on those allegations, the district court held that the plaintiffs had plausibly alleged irrevocable liability to purchase the ADRs in the U.S. *Id.* at 826–27.

Plaintiffs provide no such details here.  Instead, they allege only that they made their purchases through brokers headquartered in the United States "on the OTC Pink, a New York Based [sic] trading venue," and offer the general allegation that the two depositary banks[12] of CD Projekt's unsponsored ADRs designated offices in New

---

[12] Although Plaintiffs allege that there were "two ADR depositaries of CD Projekt ADRs during the class period" (¶ 11), there were three.  (Exs. F, G, and H; Def. Decl. at 2.)

York "as the location for shareholders to tender their ADRs in exchange for common shares." (¶¶ 7–9, 11).  They do not allege: (1) the number of unsponsored ADRs purchased[13]; (2) who directed the purchase order and where they were located; (3) who placed the buy order and where they were located; (4) the office from which the depositary banks issued the ADRs; (5) whether Plaintiffs paid for the ADRs from U.S.-based bank accounts; or (6) where the transfer of title for the ADRs they purchased was recorded.  Without such fundamental allegations, Plaintiffs have not plausibly alleged that they incurred irrevocable liability "to take and pay for" the unsponsored ADRs in the U.S., and thus have not plausibly alleged a transaction within the territorial scope of the Exchange Act.  *Toshiba*, 896 F.3d at 949.

### B.   Plaintiffs Failed to Allege That Defendants' Conduct Was "In Connection With" Plaintiffs' Purchase of the Unsponsored ADRs

In addition to failing to sufficiently plead a domestic transaction, dismissal is required because Plaintiffs have not sufficiently alleged Defendants' involvement in the establishment of the unsponsored ADRs or F shares.

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale" of a security "any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b).  "[F]or fraud to be in connection with the purchase or sale of any security, it must touch the sale—*i.e.*, it must be done to induce the purchase at issue." *Toshiba*, 896 F.3d at 951.  Accordingly, a "court should consider whether the plaintiff has shown some casual connection between the fraud ***and the securities transaction in question***." *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999).

In *Toshiba*, the Ninth Circuit considered three factors in assessing whether the plaintiffs there had sufficiently pled "Toshiba's connection to the ADR transactions": (1) whether they had "clearly set[] forth the transactions"; (2) whether "Toshiba was

---

[13] Although the Certifications attached to the CAC as Exhibit 1 identify the number of "common stock" shares Plaintiffs acquired, they do not identify whether those shares were unsponsored ADRs, F shares, or something else.  (Dkt. 41-1.)

1   indeed involved in the establishment of the ADRs"; and (3) given that one of the

2   depositary banks for Toshiba ADRs was "one of Toshiba's largest ten shareholders"

3   and that U.S. investors held "more than 11% of the Company's outstanding shares,"

4   whether Toshiba had been involved in helping the institution acquire those shares.

5   896 F.3d at 951–52.   Applying those same factors here shows that there is no

6   plausible connection between Defendants and the unsponsored CD Projekt ADRs

7   and F shares.

8          First, Plaintiffs have not "clearly set[] forth the transactions." *Id.* at 951.  The

9   Complaint "omits basic details about ADRs" and "fails to include factual allegations

10  regarding the over-the-counter market on which [CD Projekt] ADRs are listed,

11  whether [CD Projekt] ADRs are sponsored, . . . the Form F-6's [the depositary banks]

12  used to register the [CD Projekt] ADRs, the trading volume of the [CD Projekt]

13  ADRs, and the [CD Projekt] ADRs' contractual terms (along with relevant variants

14  between depositary banks)." *Id.*  It also "lacks detail regarding [Plaintiffs'] purchase

15  of the [CD Projekt] ADRs." *Id.*

16         Second, Plaintiffs have not alleged (and cannot show) that Defendants had any

17  involvement in creating the unsponsored ADRs. *Id.* at 951–52.  As noted above, the

18  depositary banks created them without Defendants' consent and Defendants have

19  remained uninvolved since.

20         Third, Plaintiffs have not alleged that any of the depositary banks are among

21  CD Projekt's largest shareholders or that U.S. investors hold a sizable percentage of

22  the Company's shares. *Toshiba*, 896 F.3d at 952.  In fact, the depositary institutions

23  are ***not*** significant shareholders of the Company.  (Def. Decl. at 3.)  Thus, unlike in

24  *Toshiba*, here there is no basis for an inference that Defendants have been involved

25  in helping the depositary banks acquire CD Projekt shares.  *See* 896 F.3d at 952 n.4.

26         Falling short on every factor taken into account by the Ninth Circuit, Plaintiffs

27  have failed to sufficiently allege Defendants' "plausible participation in the

28  establishment of the ADR program" and therefore have failed to "sufficiently ple[a]d

the 'in connection with' requirement of Section 10(b)." *Toshiba*, 424 F. Supp. 3d at 828.

## V. THIS ACTION SHOULD BE DISMISSED ON *FORUM NON CONVENIENS* GROUNDS

Alternatively, the Court can defer the questions of personal jurisdiction and extraterritoriality and instead dismiss Plaintiffs' claims on *forum non conveniens* grounds. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Co.*, 549 U.S. 422, 432 (2007) (explaining that district courts have discretion to defer deciding questions of personal jurisdiction and instead dismiss based on *forum non conveniens*). That path was taken in *Church v. Glencore PLC*, 2020 WL 4382280 (D.N.J. July 31, 2020), a securities fraud action against a foreign company whose unsponsored ADRs traded on a New York-based OTC market. Although the defendants had argued lack of personal jurisdiction, the court chose to dismiss the action on *forum non conveniens* grounds. *Id.* at *3–7; *see also Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 1002 (2d Cir. 1993) (dismissing securities action "on the ground of forum non conveniens"). Dismissal based on *forum non conveniens* likewise is appropriate here because Poland is an adequate alternate forum, and the balance of public and private interests favor litigating this case there. *Tuazon*, 433 F.3d at 1177.

The alternate forum "test is easy to pass; typically a forum will be inadequate only where the remedy provided is so clearly inadequate or unsatisfactory, that it is no remedy at all." *Id.* at 1178; *see also id.* ("[T]he fact that the substantive law" in the foreign forum "may be less favorable is relevant only if it would completely deprive plaintiffs of any remedy or would result in unfair treatment."). Poland is an adequate alternate forum. Defendants would consent to service of process there and Plaintiffs can bring their securities claims there based on the same allegations in this action and, if they prevail, obtain a remedy. (Def. Decl. at 4.) *See* Lemonnier, *supra*, at 530–34. And indeed, other courts have held that Poland is an adequate alternative forum in a range of tort and contract actions. *See supra* at 20.

The public and private interest factors—which focus on the location of the parties, convenience of the forum, and sovereignty interests—also favor dismissal. *See Tuazon*, 433 F.3d at 1180–81. All Defendants and most (if not all) the important documentary evidence and current and former CD Projekt employees likely to be material witnesses are all located in Poland. (Def. Decl. at 4). *See Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1146 (9th Cir. 2001) (explaining that courts should focus on "the materiality and importance of the anticipated evidence and witnesses' testimony and then determine their accessibility and convenience to the forum"); *see also Howe v. Goldcorp Invs., Ltd.*, 946 F.2d 944, 951 (1st Cir. 1991) (dismissing on *forum non conveniens* grounds where "the relevant actions, statements and omissions that underlie the plaintiff's claims of 'misrepresentation' or 'fraud' originated in Canada" and "[m]ost of the background facts that might show those statements or omissions to be materially false or misleading occurred in Canada"). Poland also has a stronger local interest in this case, as countries have a significant interest in resolving disputes concerning their own domestic companies and their executives. *See, e.g.*, *Windt v. Qwest Commc'ns Int'l, Inc.*, 529 F.3d 183, 193 (3d Cir. 2008) (explaining that the Netherlands had "a substantial interest" in resolving a dispute related to "the alleged mismanagement of a Dutch company by Supervisory Board members and executives of that Dutch company"); *see also STM Grp., Inc. v. Gilat Satellite Networks Ltd.*, 2011 WL 2940992, at *9 (C.D. Cal. July 18, 2011) (Peru had a stronger local interest than California where alleged misconduct took place in Peru). And because "this Court is heavily burdened and congested," *BCS Bus. Consulting Servs. Pte. Ltd. v. Baker*, 2020 WL 3643486, at *4 (C.D. Cal. Apr. 17, 2020), proceeding in Poland may allow for more efficient resolution of this matter.

Because the *forum non conveniens* factors demonstrate that Poland is a more suitable forum, this case should be dismissed.

## VI.   PLAINTIFFS' SECTION 10(B) CLAIM FAILS

Should the Court reach an evaluation of the sufficiency of the CAC's factual allegations, it will find that Plaintiffs fall well short of the heightened pleading standards for a Section 10(b) claim.

To state a claim under Section 10(b), Plaintiffs must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) loss or proximate causation, and (6) damages.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).  The Court need not accept conclusions asserted as facts or any other unsupported, conclusory allegations.  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996).  Nor should it accept allegations based on unwarranted deductions or unreasonable inferences, or allegations that contradict matters properly subject to judicial notice.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  The Court may consider, however, materials incorporated by reference in the complaint and other matters subject to judicial notice.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).

Further, when alleging a violation of Section 10(b), a plaintiff must satisfy the heightened requirements of the PSLRA.  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014).  These requirements are an "unusual deviation from the usually lenient requirements of federal rules pleading," *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001), and present an "elephant-sized boulder" that a plaintiff's factual allegations must overcome, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 461 (6th Cir. 2014).  Two requirements are pertinent here, both of which must be pled with "particularity." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

*Falsity*:   Under the PSLRA, the plaintiff must identify specifically each statement alleged to have been false or misleading, and provide the reasons why the

statement was false or misleading **when made**.  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876–77 (9th Cir. 2012).

    *Scienter*:  To allege scienter, the plaintiff must allege facts that give rise to a "strong inference" that the defendant acted with the intent to deceive shareholders or in reckless disregard of the truth.  *Ronconi*, 253 F.3d at 429.  A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007).  Courts must consider nonculpable explanations for a defendant's conduct, *id.*, as well as the economic or logical plausibility of a plaintiff's claims, *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020)

    Here, in addition to Plaintiffs' failure to meet the "in connection with" requirement (*see* Section IV. B. above), Plaintiffs' Section 10(b) claim should be dismissed for two additional reasons: (1) Plaintiffs fail to plead falsity with particularity, and (2) Plaintiffs fail to plead a strong inference of scienter.

## A.    Plaintiffs Fail to Plead Falsity with Particularity

    Plaintiffs challenge nine statements made during the Class Period, all of which pre-date the release of Cyberpunk.  (¶¶ 39–46.)  All nine statements are inactionable because they are (1) demonstrably true, (2) inactionable puffery, (3) opinions, or (4) forward-looking statements accompanied by meaningful cautionary language.

### 1.    Many of the Challenged Statements Are Demonstrably True

    Many of the challenged statements are not actionable because they were unquestionably true when made.  *See In re Tesla Motors, Inc. Sec. Litig.*, 671 F. App'x 670, 670 (9th Cir. 2016) (affirming dismissal of 10(b) claims because "[a]lmost all of the allegedly false or misleading statements were true").  Plaintiffs claim that statements indicating Cyberpunk was "complete," "playable," and "releasable" (*e.g.*, ¶¶ 39, 41–42), were false or misleading because the bugs in the current gen versions made it "virtually unplayable" upon release.  (¶47.)  But nothing

1  in the CAC suggests that Cyberpunk's substance—"[t]he quests, the cutscenes, the

2  skills and items; all the adventures [the game] has to offer"—was lacking.  (Ex. P at

3  54.)  Plaintiffs do not allege that Cyberpunk was not operational or could not be

4  completed by gamers.   Nor could they—both Sony and Microsoft certified

5  Cyberpunk on the current generation consoles months before it was released.  (Ex. R

6  at 60.)  The fact that Cyberpunk had glitches or bugs that purportedly "mar[red] the

7  game" or made it "difficult to look at" did not render it incomplete or unplayable.

8  (¶¶ 48–49.)

9         **2.     The Majority of the Challenged Statements Are Inactionable
            Puffery**

10

11         Most of the challenged statements are not actionable because they are

12  unverifiable puffery.  *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759

13  F.3d 1051, 1060 (9th Cir. 2014) (holding that "mere corporate puffery, [such as]

14  vague statements of optimism like 'good,' 'well-regarded,' or other feel good

15  monikers, are not actionable").   Defendants' rosy descriptions of the Company's

16  progress (*e.g.*, "we're very close," "we feel secure,") and Cyberpunk (*e.g.*, "top-

17  quality," "positive impressions," "amazing," "remarkable potential," "performs

18  great," "complete and playable," "no problem,") are precisely the type of puffery

19  courts routinely reject.[14]   (¶¶ 39–45).

20         *Kelly v. Electronic Arts, Inc.*, a Section 10(b) case with virtually identical facts,

21  confirms that the challenged statements here are puffery.  71 F. Supp. 3d 1061 (N.D.

22

---

23  [14] *In re Target Corp. Sec. Litig.*, 955 F.3d 738, 743 (8th Cir. 2020) ("we feel really
    good about where we are today"); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th
24  Cir. 2010) ("I am optimistic about . . . performance"); *Ortiz v. Canopy Growth Corp.*,
    2021 WL 1851923, at *18 n.19 (D.N.J. May 7, 2021) ("top-quality"); *Smith v.*
25  *NetApp, Inc.*, 2021 WL 1233354, at *8 (N.D. Cal. Feb. 1, 2021) ("very, very close");
    *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) ("quality");
26  *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757 (S.D.N.Y. 2018)
    ("remarkable progress"); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052,
27  1070 (C.D. Cal. 2012) ("is ready for prime time"); *Wozniak v. Align Tech., Inc.*, 850
    F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) ("we're getting really great feedback"); *In*
28  *re Apple Comput., Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1017 (N.D. Cal. 2002) ("the
    whole thing is perfect").

Cal. 2014). *Kelly* involved video game developer Electronic Arts's ("EA") launch of Battlefront 4, another iteration of one of EA's most lucrative video game franchises. *Id.* at 1063. Like Cyberpunk, Battlefront 4's release date coincided with the release of next generation consoles. *Id.* at 1064. Like CD Projekt, EA confirmed that Battlefront 4 would be playable on both the current generation and next generation consoles. *Id.* Before it was released, Battlefront 4, like Cyberpunk, "garnered the biggest reaction" at E3 and received many awards. *Id.* Like the Individual Defendants here, EA executives warned investors that Battlefront 4 was "a really complicated game developed across five separate platforms," and that it was difficult to "develop a game at the same time as the [next generation gaming consoles]." *Id.* And like Cyberpunk, Battlefront 4's launch was plagued by glitches and bugs and "was met by a deluge of customer complaints," with some customers claiming the game was "unplayable." *Id.* 1065. *Kelly* held that the defendants' pre-release statements were "inactionable statements of opinion, corporate optimism, or puffery," including (1) statements referencing "de-risk[ing]" Battlefront 4; (2) that Battlefront 4 was "the best transition game[];" (3) "We feel . . . we're well ahead of this transition, and we're going to nail it," and EA was "battle-tested" and "ready to launch BF4 on next-generation gaming consoles."; and (4) "EA's launch software '[is] head and shoulders above where we were last time' and that EA '[is] certainly bullish as we come into this platform generation.'" *Id.* at 1070–71. Accordingly, the court granted the defendants' motion to dismiss. *Id.* at 1072.[15] Given the striking factual similarities here, the Court should do the same.

---

[15] In a subsequent order, the *Kelly* court dismissed the plaintiffs' amended complaint with prejudice because (1) plaintiffs failed to provide "clarity to the term 'de-risk''; (2) "plaintiffs' allegations regarding prior game launch failures do not make any of the alleged misstatements actionable;" and (3) the statement that "when you are building a game on an unfinished platform with unfinished software, there are some things that can't get done until the very last minute because the platform wasn't ready to get done" was not false. *Kelly v. Elec. Arts, Inc.*, 2015 WL 1967233, at *7–9 (N.D. Cal. Apr. 30, 2015).

### 3.    The Challenged Opinion Statements Are Inactionable

Several of the challenged statements are not statements of fact, but opinions, which are "generally not actionable."  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021). (*See, e.g.*, ¶ 45 ("***[W]e believe*** that the game performs great on every platform."); ¶ 46 ("***[W]e believe*** that the level [of bugs] will be as low as to let gamers not see them. . . . *I would say* general features and many of [the bugs] are already fixed.")). *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015) ("[T]he words 'I believe' themselves admit[] [the] possibility" that the opinion "could later prove . . . erroneous."); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 488 (S.D.N.Y. 2018) (phrases like "suggests potential," and "we felt," are opinions).)

There are only three circumstances in which an opinion may be actionable: (1) if the speaker did not "actually hold[] the stated belief;" (2) if the opinion contained a false fact; or (3) if a reasonable investor understood the opinion to convey a fact "about the speaker's basis for holding that view," and that fact was false.  *Golub v. Gigamon Inc.*, 994 F.3d 1102, 1106 (9th Cir. 2021).

No such circumstances are present here.  For example, Plaintiffs do not allege facts suggesting that, before the release, the Individual Defendants did not "believe that the level [of bugs] [would] be . . . low." (¶ 46.)  *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 617 (9th Cir. 2017) (concluding that plaintiff had not alleged that an opinion statement was a material misrepresentation because the plaintiff had not alleged "facts that would allow [the court] to infer subjective falsity").  Nor have Plaintiffs alleged that the challenged opinions concerned facts that were objectively false at the time the statements were made.  For example, Plaintiffs fail to plead that, before the release, "many of [the bugs]" had not been "fixed." (¶ 46.)  *See Ikeda v. Baidu, Inc.*, 2021 WL 1299046, at *9 (N.D. Cal. Apr. 7, 2021) ("Plaintiff has not alleged specific facts that suggest that, at the time of the 2018 and 2019 Annual Reports, Baidu was not in compliance with

Chinese regulations."). And Defendants' post-release statements about what they might have done differently do not render their pre-release opinions actionable. *See Anderson v. Peregrine Pharms., Inc.*, 654 F. App'x 281, 282 (9th Cir. 2016) ("It is easy for Plaintiffs to see what went wrong in hindsight; but that does not make Defendants' failure to see that problem prior to announcing test results fraudulent.").

### 4. The Challenged Forward-Looking Statements Are Inactionable Under the PSLRA's Safe Harbor

Finally, the remaining challenged statements are facially forward-looking and subject to the PSLRA's "safe harbor."[16] (*See, e.g.*, ¶ 40 ("[C]ustomers [will] receive a top-quality product."); ¶ 41 ("everything is on track"); *id.* ("[T]he current version . . . will be playable from the beginning . . . you will be able to play the current-gen version on next-gen from day 1."); ¶ 46 ("[W]hat gamers will get will be different from what . . . previewers got.").) *See, e.g.*, *Wochos*, 985 F.3d at 1192 (holding "on track" was forward-looking).)[17]

To overcome the safe harbor, Plaintiffs must demonstrate that the forward-looking statements were not accompanied by "meaningful cautionary language" *and* that the speaker had "actual knowledge" that their statements were false when made. 15 U.S.C. § 78u–5(c)(1); *see In re Cutera*, 610 F.3d at 1112. Plaintiffs fail under both prongs.

*First*, the statements were accompanied by meaningful cautionary language. The Company warned investors that "[d]eveloping games is a highly complex, iterative and costly activity, based on creative effort and requiring continuous development and refinement of technological solutions. This increases the likelihood of *incorrect estimation of the required workload*, delays due to technical issues in the programming layer (*e.g.*, *failure to meet quality assurance criteria or technical*

---

[16] 15 U.S.C. § 78u-5 (explaining when the PSLRA safe harbor applies)

[17] 15 U.S.C. § 77z-2(i)(1) (defining forward-looking statements as statements containing, among other things, "the plans and objectives of management for future operations, including plans or objectives relating to . . . products or services.").

*glitches*).”   (Ex. J at 36.)   This “is precisely what Plaintiffs allege eventually happened.”  *Costanzo v. DXC Tech. Co.*, 2020 WL 4284838, at *9 (N.D. Cal. July 27, 2020).   Furthermore, the Company repeatedly warned investors that their “forward-looking statements . . . are subject to various risks and uncertainties and actual results for fiscal year 2020 and beyond could differ materially from CD Projekt’s current expectations,” and that its realization of its forward-looking statements depended on, “without limitation, . . . demand and acceptance of the Company’s products and services, [and] . . . the ability to attract and retain customers.” (Ex. Y at 85; Ex. Z at 88.)  The Ninth Circuit has held that such language is sufficient to trigger the safe harbor.  *Intuitive Surgical*, 759 F.3d at 1059 (“Actual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties”); *In re Cutera*, 610 F.3d at 1112 (“[F]actors like Cutera’s ability to continue increasing sales performance worldwide could cause variance in the results.”).   Furthermore, CD Projekt warned that the “coronavirus pandemic introduces the risk that certain members of the team may become unable to perform their assigned duties.”  (Ex. J at 35.)

*Second*, the challenged forward-looking statements are not actionable because, as discussed below, Plaintiffs fail to plead any facts suggesting that Defendants knew their statements were false when made.  Nothing in the CAC suggests, for example, that Defendants knew in April 2020—eight months before Cyberpunk was released—that customers would not “receive a top-quality product.”  (¶ 40.)

## B.   Plaintiffs Fail to Plead a Strong Inference of Scienter

Plaintiffs’ claims are separately subject to dismissal because they do not plead the required “strong inference” of scienter.   Scienter is an “intent to deceive, manipulate, or defraud.”  *Tellabs*, 551 U.S. at 319.  Plaintiffs “must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.”  *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999).  A complaint will survive dismissal “only if a reasonable person

would deem the inference of scienter **cogent and at least as compelling** as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Thus, when analyzing scienter, courts "must consider **all** reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. Visx, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

Here, Plaintiffs fail to allege facts demonstrating that any Defendant had contemporaneous knowledge of information contradicting Defendants' public statements. Plaintiffs allege several theories of scienter, but none of them are as cogent or compelling as the opposing inference—that Defendants had high hopes for Cyberpunk and believed in the Company's ability to have the game ready for release, but nevertheless came up short of their expectations.

### 1.      Plaintiffs Fail to Allege a Plausible Motive

Plaintiffs say Defendants were motivated to commit fraud because they "were determined to release the game in 2020 and reap the financial rewards, whether or not the game was finished." (¶ 2.) But Plaintiffs' theory makes no sense: why would the Company release Cyberpunk—the biggest and most anticipated game in the Company's history—after years of development if it knew, or thought it highly likely, that the game was unplayable on current generation consoles and virtually certain to suffer poor sales while immeasurably damaging the Company's reputation? The Ninth Circuit recently and soundly rejected an identical theory of scienter. *See Endologix*, 962 F.3d at 416 ("It is improbable that [a company] would stake its existence on a [product] that the company thought was doomed to failure."). Further, Plaintiffs never explain what "financial rewards" Defendants allegedly "reaped" by prematurely releasing Cyberpunk. For their part, Defendants were aware that returns and refunds for the game decreased their share of sales royalties, (Ex. K at 39), negating any motive to release the game if it was destined to flop. Just as in *Endologix*, "[Plaintiffs' scienter] theory does not make a whole lot of sense." 962 F.3d at 415. Additionally, Plaintiffs do not allege that **any** Defendant sold a single

share of the Company's stock during the Class Period.  The absence of insider stock sales is highly relevant and undermines any inference of scienter.  *Rigel*, 697 F.3d at 884–85.  In fact, the Individual Defendants collectively lost ***over $614 million*** in the value of their holdings due to the stock price decline following Cyberpunk's release.  (Ex. L at 43; Ex. X at 82.)  Plaintiffs do not (and cannot) articulate why Defendants would render themselves the biggest victims of their own purported fraud.

> **2.  Plaintiffs' Unverified Anonymous Source Allegations Borrowed From News Articles Should be Disregarded**

Attempting to bolster their deficient scienter allegations, Plaintiffs piggyback off certain news articles published after Cyberpunk's release purportedly reflecting comments and impressions from "several people familiar with the development" of Cyberpunk and "current and former CD Projekt staff."  (¶¶ 34, 37; Ex. AA at 91, 95.) All allegations related to these articles should be disregarded for two reasons.  ***First***, the allegations have not been independently verified by Plaintiffs' counsel.  Indeed, ***all*** are borrowed from other sources, and such articles can only form the basis of factual allegations when they are combined with a plaintiff's (or his/her attorney's) own investigative efforts.  *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) ("When drafting a complaint, an attorney may [not] rely . . . on . . . article[s] . . . as the sole basis for his or her allegations.").  Here, however, the CAC does not assert that Plaintiffs' counsel conducted any independent investigative efforts whatsoever of the sources' statements.  Accordingly, the allegations premised on these articles should be stricken from the CAC.

***Second***, even assuming the individuals cited in these articles could be deemed "confidential witnesses" ("CWs"), when a securities fraud complaint relies on CW statements to establish scienter, it must (1) describe the CWs "with sufficient particularity" to establish that their statements were made "with sufficient reliability and personal knowledge," and (2) show that the statements reported by the CWs are

"indicative of scienter." *Zucco*, 552 F.3d at 995.  Here, the CAC fails to clear either hurdle.  The CAC does not "provide[] sufficient detail about [the sources'] position[s] within the [Company] to provide a basis for attributing the facts reported by [those] witness[es] to the witness[es]' personal knowledge." *Zucco*, 552 F.3d at 995.  For example, the January 16, 2021, Bloomberg article does not specify: (1) how many sources Bloomberg allegedly interviewed; (2) whether they were employed during the Class Period; (3) whether they even worked on Cyberpunk; (4) their roles; (5) and whether their roles support their allegations.  In no way does this meet the Ninth Circuit's exacting standards for considering CW allegations.  *See, e.g.*, *Applestein v. Medivation, Inc.*, 561 F. App'x 598, 600 (9th Cir. 2014) ("[T]he complaint fails to allege with requisite particularity the job titles and responsibilities of the CWs and facts supporting an inference that they had personal knowledge of the relevant information").

Furthermore, the CWs cited in these articles shed no light on any ***Defendant's*** state of mind and are thus not indicative of scienter.  Indeed, the articles do not specify when, exactly, the CWs gleaned the knowledge they purported to possess.  Plaintiffs simply hope the Court will assume those CWs possessed knowledge of Defendants' mental states at the time the alleged misstatements were made.  This the Court may not do.  *See, e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (dismissing several securities fraud complaints because the plaintiffs had not alleged that any of the CWs "made any personal contact with [the defendants] during the Class period . . . .").  All that remains is Plaintiffs' vague claim that "everyone at the studio knew the game was in rough shape and needed more time." (¶ 37.)  The PSLRA requires much more, and courts routinely reject similarly vague allegations.  *See, e.g.*, *Zucco*, 552 F.3d at 995 (rejecting CW statements based on "vague hearsay"); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1052–54 (N.D. Cal. 2019) (finding CWs' statements that "everyone 'from the CEO on down' was aware of problems" was "unreliable").

### 3.     Plaintiffs' "Obvious Defects" Theory Fails

Next, Plaintiffs allege that Defendants must have known Cyberpunk was unplayable because: (1) the bugs in the game were obvious (¶¶ 63, 72, 79, 86); (2) Defendants admitted awareness of bugs (¶ 69); and (3) internal and external testers would have revealed the bugs (¶¶ 66, 74, 81, 88).  But Plaintiffs miss the point—knowing about some bugs is not the same as knowing the game would be unplayable upon release.  Mr. Kiciński warned that "some bugs" might make their way into the released version because "[s]uch a big game can't be entirely bug-free."  (Ex. V at 73.)  But no pled facts suggest Defendants knew the bugs would be as prevalent as they were on the current generation consoles.

Plaintiffs claim that Mr. Iwiński admitted that the Company did not show gameplay or provide advance copies of Cyberpunk on the current generation consoles "to conceal the game's defects."  (¶¶ 64–65, 73, 80, 87.)  But that is simply not true.  The CAC itself quotes Mr. Iwiński as saying that the Company did not show current gen gameplay footage because the Company was "updating the game on last-gen consoles until the very last minute, and *we thought we'd make it on time*."  (¶65; Ex. W at 79.)  In other words, the Company was not hiding bugs, it was addressing them and believed it could do so successfully.

Plaintiffs attempt to strengthen their "obvious defects" scienter theory by citing a video purportedly created by Cyberpunk developers allegedly depicting bugs "mirror[ing] those that users encountered in the finished game."  (¶ 38.)  But this video fails to demonstrate that Defendants knew that bugs and glitches made Cyberpunk unplayable on current generation consoles prior to the game's release for three reasons.  *First*, none of these glitches—found through years of development—can be placed in time.  *Second*, no facts suggest the same glitches were present in the released version of the game.  And *third*, many of these so-called glitches were not glitches at all, but clips of amusing gameplay, such as the protagonist riding a hotdog motorcycle that has hamburger wheels (at 1:50), riding a motorcycle that looks like

a cat (at 7:39), and human-sized chickens shooting machine guns (at 11:04).  In fact, the Forbes article Plaintiffs cite makes these exact admissions.  (Ex. BB at 98.)

### 4.   Plaintiffs' "Red Flags" Theory Fails

Next, Plaintiffs ask this Court to infer scienter on behalf of each Defendant based on Mr. Kiciński's statement that "we ignored the signals about the need for additional time to refine the game on the base last-gen consoles," and that this statement constituted an admission that all Defendants ignored "red flags."  (¶¶ 68, 75, 82, 89.)  This allegation fails to establish scienter for two reasons.

***First***, Plaintiffs mischaracterize Mr. Kiciński's statement.  The Company did not "ignore[] red flags," as Plaintiffs allege— Mr. Kiciński clarified that the current gen version of Cyberpunk had more bugs than they expected because of the difficulty inherent in making a game run smoothly on systems with different technological capabilities.  "[Y]our question was about the focus and the cause of ours ignoring, ***so to speak***, the shortcomings of the current-gen version.  ***It is more about us looking . . . at the PC and next-gen performance rather than current-gen***." (Ex. W at 78) (emphasis added).   At bottom, Mr. Kiciński's statement amounts only to an admission that the Company misjudged how much time should be spent optimizing the current generation consoles. This is, at most, possible mismanagement, which is not actionable under Section 10(b).  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Congress by [Section] 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.").

***Second***, Mr. Kiciński's statement does not rise to the level of deliberate recklessness, which is defined as "an ***extreme*** departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so ***obvious*** that the actor must have been aware of it." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021) (emphasis in original).   CD Projekt took many steps to optimize Cyberpunk, including internal and external testing and quality assurance, (Ex. W at 77), and

repeatedly delaying the game's release to ensure there was enough time to complete optimization (*Id*. at 78-79).  Moreover, Cyberpunk was certified by both Sony and Microsoft nearly two months before it was released.  (Ex. R at 60.)  But even though CD Projekt optimized the current gen version "until the very last minute," its efforts fell short.  (Ex. W at 79.)  In ***hindsight***, CD Projekt underestimated (1) "the scale and complexity of the [bugs]," (*id*. at 76), (2) how long it would take to address those bugs (*id*. at 78); and (3) the impact COVID-19 had on external testers' ability to properly evaluate the game, (*id*. at 77).  That CD Projekt's optimization efforts fell short does not mean it committed an "***extreme*** departure from the standards of ordinary care."  *Prodanova*, 993 F.3d at 1106; *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *17 (N.D. Cal. July 21, 2020) ("An unsuccessful sales strategy and disagreement within the company over its approach . . . does not support an allegation that [the defendant] was deliberately reckless.").

### 5.  Plaintiffs' Remaining Theories of Scienter Fail

Plaintiffs' remaining theories of scienter are meritless.

***Core operations***.  Plaintiffs allege Defendants must have known that Cyberpunk had severe glitches rendering it unplayable upon release because it was the Company's "only major release" in 2020 and was therefore the "main focus" during the Class Period—a "core operations" argument.  (¶¶ 62, 71, 78, 85.)  Proving scienter under the core operations theory is difficult and requires that a plaintiff "produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement."  *Intuitive Surgical*, 759 F.3d at 1062.  Plaintiffs have pled neither that any Defendant was involved in addressing the specific glitches in Cyberpunk, nor any witness accounts demonstrating such involvement.  And while Cyberpunk was an important product for CD Projekt, it was not the only one.  CD Projekt was also working on other projects during the Class Period.  (Ex. CC.)

*"Fake" promotional video*.  Finally, Plaintiffs allege that the promotional gameplay trailer the Company released at E3 in June 2018 was "almost entirely fake" because it "was not made up of actual gameplay footage but rather prerendered graphics," and therefore was evidence of scienter.  (¶¶ 35, 70, 77, 84, 91.)  However, the promotional video[18] was never advertised as a final rendering of the game, and contains numerous warnings that the game was in development and that the graphics and gameplay depicted were aspirational and subject to change.[19]  Further, the video was released in June 2018—it cannot speak to any Defendant's state of mind during the Class Period—*i.e.*, 18 months later.  *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal. 2005) (refusing to consider "facts relating to scienter dating from before the proposed class period because by definition scienter is the state of mind accompanying misstatements forbidden by § 10(b)").

### 6.   Plaintiffs' Theories of Scienter Fail Under Holistic Examination

In conducting a "holistic" review of scienter allegations, "a court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991 (citing *Tellabs*, 551 U.S. at 323–24).  *See also Luna v. Carbonite, Inc.*, 2020 WL 6205786, at \*5-6 (D. Mass. Oct. 22, 2020) (finding no scienter where a company released non-operational software because the plaintiff did not show that the defendants acted "beyond the level of inexcusable negligence" and

---

[18]Available at https://www.youtube.com/watch?v=sjH48Xs-5OA.

[19] The following warning appears in writing throughout the video: "WORK IN PROGRESS—DOES NOT REPRESENT THE FINAL LOOK OF THE GAME." Furthermore, the narrator makes various verbal warnings during the video: "Before we start, a small but important disclaimer: the gameplay you're about to see is from a work in progress version of the game. Everything you see is potentially subject to change" (0:30); "Keep in mind, that what you see here is not final.  We just want to give you a glimpse of what will be possible in the released game" (0:52); and "Just a reminder, everything you've seen and are about to see, including this particular feature we're about to show you, is from a work in progress version of the game, and may change over the course of development" (42:01).

because the more compelling inference was that the company "believed [the software] was fixable" through various patches and bug fixes, which are "standard fare" after the release of new software).

Plaintiffs' theory is that Defendants knew the Company's biggest game ever was unplayable when they released it.  Because Defendants had nothing to gain and everything to lose by releasing a faulty game, Plaintiffs' theory makes no sense economically, logically, or otherwise—and certainly is not the "cogent" and "compelling" inference required by the PSLRA.  On the contrary, Plaintiffs' allegations and judicially noticeable facts support the inference that Defendants struggled during a global pandemic to put the final pieces together on the Company's flagship game and, in hindsight, wished they had done things differently.  But that simply is not actionable under Section 10(b).

## VII.   PLAINTIFFS' SECTION 20(A) CLAIM FAILS

Plaintiffs fail to plead a primary violation of Section 10(b), so their Section 20(a) claim also fails.  *See Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

## VIII.  CONCLUSION

For the foregoing reasons, the CAC should be dismissed.

Dated:      August 12, 2021              COOLEY LLP


                                         By: */s/ Koji F. Fukumura*
                                             Koji F. Fukumura

                                         Attorneys for Defendants
                                         CD Projekt S.A., Adam Michal
                                         Kicinski, Marcin Iwinksi, Piotr Marcin
                                         Nielubowicz, and Michał Nowakowski