Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Movant and
Lead Counsel for the Class

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW TRAMPE, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CD PROJEKT S.A., ADAM MICHAL KICINSKI, PIOTR MARCIN NIELUBOWICZ, and MICHAŁ NOWAKOWSKI,<br><br>Defendants. | Case No. 2:20-cv-11627-FMO-RAO<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**<br><br><u>CLASS ACTION</u><br><br>JUDGE: Fernando M. Olguin<br>Hearing Date: December 2, 2021<br>Time: 10:00 a.m.<br>CTRM: 6D – First Street Courthouse |

## TABLE OF CONTENTS

I.   Introduction .................................................................................1

II.  Factual Background ......................................................................3

  A. Video Game Industry Background ................................................3

  B. Company Background and Development of Cyberpunk 2077...................4

  C. The Reality – Cyberpunk 2077 Was Not Playable on Current Generation
    Consoles....................................................................................5

  D. The Truth Emerges .....................................................................7

III. Argument ..................................................................................10

  A. Defendants are Subject to Personal Jurisdiction............................11

    1. Defendants are Subject to Specific Jurisdiction ..........................11

      a. Defendants' Purposefully Directed their False Statements at United
        States Investors.................................................................11

      b. Plaintiffs' Claims Directly Arise out of Defendants' US Contacts...13

      c. Exercising Personal Jurisdiction Over Defendants is Fair and
        Reasonable .....................................................................13

    2. CD Projekt is Subject to General Jurisdiction ..........................16

    3. The Individual Defendants are Subject to Jurisdiction as Control
      People of CD Projekt...........................................................17

  B. The Complaint Alleges that The Transactions Are Within the Territorial
    Scope of the Exchange Act ...........................................................17

    1. Plaintiffs' Transactions Are Within the Scope of the Securities
      Exchange Act Under Morrison ...............................................17

    2. Defendants' Conduct Was In Connection with the ADRs and Shares .19

  C. Dismissal on a Forum Non Conveniens Basis is Unwarranted ...............20

i

1.  Standard for Forum Non Conveniens Dismissal.......................................20

2.  Defendants Have not Shown Poland to be Adequate. ...........................21

3.  Balancing of the Private and Public Interest Factors Favors the U.S. .21

    a.  Private Interest Factors ....................................................................22

    b.  Public Interest Factors.......................................................................23

D. The Complaint Alleges the Elements of Securities Fraud ......................24

1.  The Complaint Alleges Falsity .................................................................25

    a.  Defendants' Statements Were False....................................................25

    b.  Defendants' Statements Were Not Puffery..........................................27

    c.  To the Extent that Any of Defendants' Statements Were Statements of Opinion, they are Actionable Under *Omnicare* ............................29

    d.  Because Defendants did not Register Their Securities in the United States, The Safe Harbor Does not Apply ............................................30

2.  The Complaint Alleges Scienter................................................................31

    a.  The Complaint Establishes a Plausible Motive .................................32

    b.  for the Court Should Not Disregard Media Reports ........................33

    c.  The Complaint Alleges Obvious Defects that Support a Strong Inference of Scienter ........................................................................35

    d.  The Complaint Identifies Red Flags that Support Scienter.............36

    e.  The Core Operations Doctrine Supports a Strong Inference of Scienter ..............................................................................................37

    f.  Defendants' Fake Promotional Video Supports a Strong Inference of Scienter............................................................................................39

    g.  A Holistic Examination of the Complaint Supports a Strong Inference of Scienter ........................................................................40

E. The Complaint Alleges Control Person Liability ...................................40

ii

**IV.  Conclusion** ......................................................................................**40**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS – Case No. 2:20-cv-11627-FMO-RAO

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

Other Authorities

4

5

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,

6
   677 F.3d 60 (2d Cir. 2012)........................................................................17

7

*Artec Grp., Inc. v. Klimov*,

8
   No. 15-CV-03449-RMW, 2015 WL 9304063 (N.D. Cal. Dec. 22, 2015) ..........14

9

*Ashcroft v. Iqbal*,

10
   556 U.S. 662 (2009)................................................................................24

11

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,

12
   2 F. Supp. 3d 550 (S.D.N.Y. 2014)............................................................18

13

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,

14
   856 F.3d 605 (9th Cir. 2017)....................................................................29

15

*Contact Lumber Co. v. P.T. Moges Shipping Co.*,

16
   918 F.2d 1446 (9th Cir. 1990) .................................................................20

17

*Corp. Inv. Bus. Brokers v. Melcher*,

18
   824 F.2d 786 (9th Cir. 1987)...............................................................14, 16

19

*Daimler AG v. Bauman*,

20
   571 U.S. 117 (2014)...............................................................................16

21

*Dean v. China Agritech, Inc.*,

22
   No. CV 11-01331-RGK PJWX, 2011 WL 5148598 (C.D. Cal. Oct. 27, 2011) .34

23

*Dole Food Co. v. Watts*,

24
   303 F.3d 1104 (9th Cir. 2002) .................................................................11

25

*Dura Pharms., Inc. v. Broudo*,

26
   544 U.S. 336 (2005)...............................................................................25

27

28

iv

*Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.*,
  905 F.3d 597 (9th Cir. 2018)................................................................14

*Gates Learjet Corp. v. Jensen*,
  743 F.2d 1325 (9th Cir. 1984) ............................................................23

*Gerritsen v. Warner Bros. Ent. Inc.*,
  112 F. Supp. 3d 1011 (C.D. Cal. 2015) ..............................................26

*Gutierrez v. Advanced Med. Optics, Inc.*,
  640 F.3d 1025 (9th Cir. 2011) ............................................................20

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ......................................................36, 37

*Howe v. Goldcorp Invs., Ltd.*,
  946 F.2d 944 (1st Cir. 1991) ..............................................................24

*In re Apple Inc. Sec. Litig.*,
  No. 19-CV-02033-YGR, 2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .............34

*In re Capstone Turbine Corp. Sec. Litig.*,
  No. CV158914DMGRAOX, 2018 WL 836274 (C.D. Cal. Feb. 9, 2018) .........32

*In re Connetics Corp. Sec. Litig.*,
  542 F. Supp. 2d 996 (N.D. Cal. 2008) ................................................33

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ............................................................31

*In re Daou Sys., Inc.*,
  411 F.3d 1015 (9th Cir. 2005) ............................................................32

*In re ECOtality, Inc. Sec. Litig.*,
  No. 13-03791-SC, 2014 WL 4634280 (N.D. Cal. Sept. 16, 2014).................26

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ............................................................25

v

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...................................................34

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ..........................................36, 37

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ..................................................................27

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
No. 2672 CRB (JSC), 2017 WL 66281 (N.D. Cal. Jan. 4, 2017).....................15

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
No. 7347, 2020 WL4905093 (N.D. Cal. Aug. 20, 2020) ...................................17

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
715 F.3d 716 (9th Cir. 2013)......................................................................13

*Kelly v. Elec. Arts, Inc.*,
71 F. Supp. 3d 1061 (N.D. Cal. 2014) ...................................................28

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)......................................................................26

*Lewis v. Curtis*,
671 F.2d 779 (3d Cir. 1982)........................................................................34

*Lockman Found. v. Evangelical All. Mission*,
930 F.2d 764 (9th Cir. 1991)......................................................................20

*Lueck v. Sundstrand Corp.*,
236 F.3d 1137 (9th Cir. 2001) ....................................... 20, 21, 22, 23

*Lynx Ventures LP v. Canadian Imperial Bank of Com.*,
No. CV 99-07160RSWLMANX, 2000 WL 33223384 (C.D. Cal. Apr. 18, 2000)
.....................................................................................................................23

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010)....................................................................................17

vi

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020)...............................................................32, 33

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ..................................................................................29

*Pac. Atl. Trading Co. v. M/V Main Exp.*,
   758 F.2d 1325 (9th Cir. 1985) ..................................................................15

*Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998) ...............15

*Pandigital, Inc. v. DistriPartners B.V.*,
   No. C 12-01588 CW, 2012 WL 6553998 (N.D. Cal. Dec. 14, 2012) .................14

*Prodanova v. H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021) ..................................................................37

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014)...............................................................36, 37

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008)...............................................................37, 38

*S.E.C. v. Abellan*,
   674 F. Supp. 2d 1213 (W.D. Wash. 2009)..........................................................20

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016)......................................................................31

*Sec. & Exch. Comm'n v. Jammin Java Corp.*,
   2016 WL 6595133 (C.D. Cal. July 18, 2016).....................................................11

*Sec. Inv. Prot. Corp. v. Vigman*,
   764 F.2d 1309 (9th Cir. 1985) ..................................................................11

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ..................................................................32

vii

*Stoyas v. Toshiba Corp.*,
   424 F. Supp. 3d 821 (C.D. Cal. 2020) .........................................................18, 19

*Stoyas v. Toshiba Corp.*,
   896 F.3d 933 (9th Cir. 2018)...................................................................17, 19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).......................................................................... 24, 31, 32

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
   No. CV1602942SJOKSX, 2017 WL 2378369 (C.D. Cal. May 31, 2017)....14, 15

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) .............................................................25

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996)...............................................................27

*Weisel Partners LLC v. BNP Paribas*,
   No. C, 07-6198 MHP, 2008 WL 3977887 (N.D. Cal. Aug. 26, 2008)... 20, 21, 22

*Williams v. Yamaha Motor Co.*,
   851 F.3d 1015 (9th Cir. 2017) ............................................................16

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
   433 F.3d 1199 (9th Cir. 2006) .............................................................11

*Zelman v. JDS Uniphase Corp.*,
   376 F. Supp. 2d 956 (N.D. Cal. 2005) ...................................................39

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B) .......................................................................25

15 U.S.C. § 78u-5 ...................................................................................30

15 U.S.C. § 78u-5(a) ...............................................................................30

viii

## <u>Other Authorities</u>

Mariola Lemonnier, Poland: Investor Protection in the Polish Capital Market –
   Selected Issues, Global Securities Litigation And Enforcement (Pierre-Henri
   Conac & Martin Gelter eds., 2019)........................................................................22

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS – Case No. 2:20-
cv-11627-FMO-RAO

## I.    Introduction

CD Projekt, SA is a Polish video game developer. As a relatively small video game company, CD Projekt competes with larger developers by focusing almost all of the company's efforts on one single game at a time, releasing a new title once every several years. From 2015 to 2020, that game was Cyberpunk 2077. Beginning in January of 2020 CD Projekt assured the public that Cyberpunk 2077 was a complete and playable game and was pending final refinements before release on multiple platforms, including the highly popular PlayStation 4 and Xbox One gaming consoles. Throughout 2020, CD Projekt assured the public that it had essentially completed versions of the game for those two consoles. In reality, however, the games were virtually unplayable on the PlayStation 4 and Xbox One consoles. Having delayed the game several times however, CD Projekt's executives were determined to release the game in 2020 and reap the financial rewards, whether or not the game was actually finished. CD Projekt attempted to conceal the fact that the Sony PlayStation 4 and Microsoft Xbox One games did not work until the last moment by refusing to provide advance copies of those versions of the game to reviewers. However, when CD Projekt released the game, the problems became immediately obvious, with fans expressing their outrage on the internet and demanding refunds. Sony and Microsoft responded to this customer outrage, with Microsoft placing a warning label about the game's lack of functionality on their electronic Xbox store, and Sony removing the game from their electronic PlayStation store altogether. As a result CD Projekt's price declined by more than 25%, harming investors.

Defendants move to dismiss for lack of personal jurisdiction, pointing to the facts that CD Projekt is a Polish company, that the individual defendants are Polish residents, and that they did not register their shares in the United States, with shares and ADRs trading on the US market without their consent. However, Defendants' argument is without merit because Defendants purposefully directed

their misstatements at American investors, participating in US based investor road shows and adjusting the date of a quarterly report to avoid clashing with US Thanksgiving. Because this lawsuit directly arises out of these acts, personal jurisdiction exists over Defendants. In addition, given that CD Projekt obtains a majority or near majority of their sales from the US, general exercise of personal jurisdiction is appropriate as well.

Defendants also claimed that Plaintiffs' transactions were beyond the territorial scope of the Exchange Act. This claim too is without merit. Plaintiffs' transactions are domestic transactions because they were executed by Plaintiffs in the United States. Defendants claim that their conduct was not "in connection with" US purchases of their securities is also without merit because, again, Defendants took concrete steps to solicit sales from US persons.

Defendants' argument that this case should be dismissed on *forum non conveniens* grounds also lacks merit. First, Defendants fail to show that Poland is an available forum because they fail to show that Poland would entertain securities claims by US plaintiffs who purchased securities on US markets. In addition, Plaintiffs' forum choice and the strong interest of the US in adjudicating securities fraud claims both weigh heavily against *forum non conveniens*.

Defendants also claim that the complaint fails to allege falsity. This is without merit. Defendants claimed that their game was playable, complete, and generally ready for launch when in fact it was in such poor shape it would ultimately be pulled from Sony's stores. Defendants' claim that their statements are puffery ignores the context, that they were meant as specific reassurances to assuage investors about repeated delays. Investors were counting the days to Cyberpunk's release because CD Projekt stood to earn over $700 million in sales from Cyberpunk sales in the first 10 days. Docket No. 47-3. p. 84. Defendants' argument that their statements were inactionable opinion statements, which only applies to a few of their statements, is meritless because those opinion statements

misled investors about important facts. And Defendants' invocation of the safe harbor for forward looking statements is irrelevant because that safe harbor only applies to those, unlike Defendants, who register their securities with the SEC.

Finally, Defendants acted with scienter. Defendants had motive to commit fraud because it became untenable to delay the game further, and their misstatements were necessary to sell a fundamentally incomplete and broken game. Further supporting scienter is evidence that the defects with the game were widely known within the company. And Defendants themselves even admitted that they ignored red flags. Additional evidence of scienter exists as well. Defendants in 2018 created a fraudulent promotional video that they claimed was taken from real gameplay but was actually faked. And the fact that the game was the company's near exclusive focus further supports scienter. Taken together, these facts support a strong inference of scienter.

For these reasons, Defendants' motion should be denied in all respects.

## II.  Factual Background

### A.  Video Game Industry Background

Video games are a $179.7 billion global industry, according to a December 22, 2020 article by Marketwatch titled "Videogames are a bigger industry than movies and North American sports combined, thanks to the pandemic." ¶21[1]. As of 2019, 46% of the video game market consisted of games for mobile devices such as smartphones or tablets. ¶22. 24% are games for PCs. 30% are games for dedicated video game consoles such as the Sony PlayStation series of consoles, and the Microsoft Xbox series of consoles. *Id.*

The video game console market is dominated by three firms: Nintendo, Sony, and Xbox. ¶23. Sony's line of video game consoles is called the

---

[1] Unless otherwise specified, references to ¶ refer to the Corrected Consolidated Amended Complaint.

PlayStation. *Id.* The PlayStation 4 released in 2013. The PlayStation 5 released in 2020. *Id.* Microsoft's home consoles are the Xbox line. *Id.* The Xbox One released in 2013. The Xbox Series X released in 2021. *Id.*

While some video game releases are exclusive to a single console or to the PC, many games are released on multiple platforms. ¶24. Releasing a game on multiple platforms requires a developer to program different versions of the game optimized for the technical specifications of a particular platform. *Id.* Often, at the end of one console generation and the beginning of the next, games are released on both the old and new generation of consoles. *Id.* In these instances, developers must adjust the game so that the new generation version can take advantage of the superior graphical capabilities of the new generation hardware, while the old generation version can run smoothly on less powerful hardware. *Id.* Xbox and PlayStation games can be purchased on physical discs or downloaded digitally from the Xbox or PlayStation electronic stores. ¶25.

**B.    Company Background and Development of Cyberpunk 2077**

Marcin Iwiński and Michal Kiciński founded CD Projekt SA in 1994. ¶26. Originally CD Projekt distributed foreign games for the polish market. *Id.* In 2002 CD Projekt formed the subsidiary CD Projekt Red to develop original games. *ID.* The first game CD Projekt Red developed was The Witcher, which it released in 2007. *Id.* In 2015, CD Projekt Red released the title The Witcher 3: Wild Hunt, which achieved major critical and commercial success. *Id.*

In 2012 CD Projekt announced it was developing a game based on the Cyberpunk role playing game. ¶27. Originally developed by Mike Pondsmith, Cyberpunk is set in a dystopian future US with advanced technology. *Id.* After releasing the Witcher 3, CD Projekt devoted substantially all of its resources to development of the Cyberpunk video game, titled Cyberpunk 2077. *Id.*

In 2018, CD Projekt unveiled an hour-long gameplay trailer at the E3 conference in Los Angeles, the world's largest gaming exposition. ¶28. In 2019

CD Projekt announced the game would be released April 17, 2020 on various platforms, including Sony's PlayStation 5 and Microsoft's Xbox Series X and Xbox Series S, Microsoft's Xbox Series One and Sony's PlayStation 4, Windows, and Stadia. ¶29. On January 16, 2020, CD Projekt released a statement attributed to Martin Iwinski announcing that while Cyberpunk was "complete and playable", the game's release would be delayed until September 7, 2020, as the Company "needed more time to finish playtesting, fixing and polishing." ¶30. On June 18, 2020, CD Projekt announced a delay to November 19, 2020. ¶31. On October 27, 2020, CD Projekt announced the game would be delayed until December 10. ¶32.

**C.    The Reality – Cyberpunk 2077 Was Not Playable on Current Generation Consoles**

In reality, Cyberpunk 2077 was unplayable on Current Generation Consoles, which constituted nearly half the market, according to Morgan Stanley estimates that projected the Playstation 4 and Xbox One to constitute 45% of Cyberpunk 2077's potential market. ¶33. Bloomberg.com, on January 16, 2021, published an article titled "Inside Cyberpunk 2077's Disastrous Rollout" (the "January 16 Bloomberg Article") revealing the truth behind the scenes, that the game was not ready for launch at any point in 2020 and that CD Projekt was fully aware of this. ¶34. According to the January 16 Bloomberg Article:

> Interviews with more than 20 current and former CD Projekt staff, most of whom requested anonymity so as not to risk their careers, depict a development process marred by unchecked ambition, poor planning and technical shortcomings. Employees, discussing the game's creation for the first time, described a company that focused on marketing at the expense of development, and an unrealistic timeline that pressured some into working extensive overtime long before the final push.

Further, the trailer that CD Projekt showed during E3 was "almost entirely fake" – the video was not made of actual game footage but prerendered graphics. ¶35. When CD Projekt announced the game would be released on April 16, 2020,

"[f]ans were elated, but internally, some members of the team could only scratch their heads, wondering how they could possibly finish the game by then. One person said they thought the date was a joke. Based on the team's progress, they expected the game to be ready in 2022. Developers created memes about the game getting delayed, making bets on when it would happen." ¶36.

The January 16, 2021 Bloomberg Article went on to state that

by the end of 2019, management finally acknowledged that Cyberpunk needed to be delayed. Last January, the company pushed the game's release to September. In March, as the pandemic began ravaging the globe and forcing people to stay inside, CD Projekt staff had to complete the game from their homes. Without access to the office's console development kits, most developers would play builds of the game on their home computers, so it wasn't clear to everyone how Cyberpunk might run on PS4 and Xbox One. External tests, however, showed clear performance issues.

…

As the launch date drew closer, everyone at the studio knew the game was in rough shape and needed more time, according to several people familiar with the development. Chunks of dialogue were missing. Some actions didn't work properly. When management announced in October that the game had "gone gold" — that it was ready to be pressed to discs [for full commercial release]— there were still major bugs being discovered. The game was delayed another three weeks as exhausted programmers scrambled to fix as much as they could.

When Cyberpunk 2077 finally launched on Dec. 10, the backlash was swift and furious. Players shared videos of screens overrun with tiny trees or characters gallivanting around without pants, and compiled lists of features that had been promised but were not in the final product.

¶37.

During the class period, it was so widely known within CD Projekt that the game was riddled with glitches that developers made a comedic video showing 10 minutes of glitches, titled "'Cyber ElBuggado 2020". ¶38. It is available at

https://www.youtube.com/watch?v=zMUSTnjLmXQ. *Id.* This video was leaked publicly in June of 2021 following a hack of CD Projekt's servers. *Id.* CD Projekt producer Slava Lukyanenka confirmed the authenticity of the video, calling it "a fun composition of bug materials collected by QA and developers through years of development." *Id.* According to an article in Forbes Magazine dated June 6, 2021, titled "CDPR Made Its Own 'Cyberpunk 2077' Internal Bug Meme Reel Ahead Of Launch", many of the glitches seen on the video mirror those that users encountered in the finished game. *Id.*

### D.    The Truth Emerges

The Company launched Cyberpunk 2077 on December 10, 2020. Consumers soon discovered that the Current-Generation Console versions of Cyberpunk 2077 were error-laden and nearly impossible to play. ¶48. *IGN* published a scathing review, stating that the Console versions "fail[] to hit even the lowest bar of technical quality one should expect even when playing on lower-end hardware. [Cyberpunk 2077] performs so poorly that it makes combat, driving, and what is otherwise a master craft of storytelling legitimately difficult to look at." *Id.*

As the New York Times explained, in an article dated December 19, 2020,

Since the release of Cyberpunk 2077 on Dec. 10, thousands of gamers have created viral videos featuring a multitude of glitches and bugs — many hilarious — that mar the game. They include tiny trees covering the floors of buildings, tanks falling from the sky and characters standing up, inexplicably pantless, while riding motorcycles.

These videos depict a game that is virtually unplayable: rife with errors, populated by characters running on barely functional artificial intelligence, and largely incompatible with the older gaming consoles meant to support it. Fans are livid.

…

One frequent glitch includes characters going into "T-Pose" — standing with their arms raised to either side — and suddenly losing

7

their pants. Users on Reddit described the phenomenon as "straight Donald Duckin' it."

Other bloopers include characters being flung through buildings seemingly out of nowhere and cars exploding for no reason. The non-player characters, or N.P.C.s, act so unnaturally that they can ruin the gaming experience.

¶49.

On December 14, facing criticism for delivering an unplayable, bug-ridden product on the PlayStation 4 and Xbox One, the Company held a conference call. ¶50. During the call, Defendant Kicinski called the Current-Generation Console versions "way below our expectations," and stated the following:

After 3 delays, we as the Management Board were too focused on releasing the game. We underestimated the scale and complexity of the issues, we ignored the signals about the need for additional time to refine the game on the base last-gen consoles. It was the wrong approach and against our business philosophy. On top of that, during the campaign, we showed the game mostly on PCs.

*Id.*

During that same call, Defendant Nielubowicz stated "we definitely did not spend enough time looking at that," when referring to issues with the Current-Generation Console versions. ¶51.

Following the release, the Company's ADRs fell from its close of $27.68/share on December 9, 2020 to close at $20.75/share on December 14, 2020, a drop of $6.93/share or 25% over 3 trading days, damaging investors. ¶52. Over that same period, CD Projekt's common share (OTGLF) price fell $21.65 per share, or 20.1%, to close at $86.00 on December 14, 2020, damaging investors. *Id.*

Then, on December 18, 2020, Sony issued a statement via the PlayStation website that it would "offer a full refund for all gamers who have purchased Cyberpunk 2077 via PlayStation Store" and "be removing Cyberpunk 2077 from PlayStation Store until further notice." ¶53. Microsoft also announced

8

that it would offer refunds for the game. *Id.* That same day, the Company stated that Sony's decision to "temporarily suspend" sales of the game came after a discussion with the Company. ¶54.

That same day, Bloomberg.com revealed a contentious video meeting involving CD Projekt's board and staff that occurred in the wake of Cyberpunk's release. ¶55. The article, titled "Cyberpunk Game Maker Faces Hostile Staff After Failed Launch", told the public that "[f]rustrated and angry staff fired questions at the board during an internal video meeting Thursday that opened with management apologizing for Cyberpunk 2077's disastrous launch, according to two people who were present." *Id.* Further, "[o]ne employee asked the board why it had said in January that the game was 'complete and playable' when that wasn't true, to which the board answered that it would take responsibility." *Id.* The article also revealed the source of CD Projekt's failure to launch a playable game.

> Many industry observers have wondered why Cyberpunk 2077, which was first announced in 2012 and was delayed three times in 2020, still appears to be unfinished. Several current and former staff who worked on Cyberpunk 2077 have all said the same thing: The game's deadlines, set by the board of directors, were always unrealistic. It was clear to many of the developers that they needed more time.

On this news, CD Projekt's ADR (OTGLY) price fell $3.44 per share, or 15.8%, to close at $18.50 per ADR on December 18, 2020, damaging investors. ¶56. CD Projekt's common share (OTGLF) price fell $9.20 per share, or 10.45%, to close at $78.80/share on December 18, 2020, damaging investors. *Id.*

On December 19, Microsoft added a warning to its Xbox store informing customers that "[u]sers may experience performance issues when playing this game on Xbox One consoles until this game is updated". ¶57. Microsoft also modified its refund policy to permit anyone who purchased Cyberpunk 2077 to receive a refund no questions asked. *Id.*

Defendants acknowledged that the issues with the game and Sony's decision to remove the game from the PlayStation Store suppressed sales and created liabilities for potential returns. ¶58. Defendant Nielubowicz stated, on an April 23 analyst call, that "the sentiment surrounding Cyberpunk and the situation with the Sony digital storefront – the fact that we were cut off from a large portion of the market – may have also indirectly affected gamers' decisions to purchase the game on other platforms, and definitely influenced sales." *Id.*

On a June 2, 2021 conference call with analysts, Defendant Nowakowski stated that, even once Cyberpunk 2077 is restored to the PlayStation Store, the rate of sales will not return to the level that they would have achieved had the game not been removed from the store. ¶59. When asked "When Cyberpunk relaunches on PS Store, what are your expectations regarding sales – are they in line with what you had previously, or will you have to invest in marketing to get back to that level?" Nowakowski stated:

> We're not really looking at it this way. Of course, getting back to PS Store will improve sales – which are currently nil. I'm assuming that once we're back, there will be some sales. However, in terms of bringing it back to the previous level – that is a tough question because the game left the store on 18 December, and it's almost June right now – so, honestly speaking, it would be unheard of to go back to the level of sales from the launch window 6 months down the line. I guess that's as much as I can go into details here; I think it would be unrealistic to expect to go back to the December level of sales with any kind of marketing.

On that call, Nielubowicz stated that "as long as we're not back on the Sony store, the general situation is not changing. ¶60. One of our leading outlets is not available and we generated most of our sales in PC digital channels." *Id.*

As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## III.    Argument

## A.  Defendants are Subject to Personal Jurisdiction
### 1.  Defendants are Subject to Specific Jurisdiction

Section 27 of the Securities Exchange Act governs personal jurisdiction for claims brought under that act. "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Sec. Inv. Prot. Corp. v. Vigman*, 764 F.2d 1309, 1316 (9th Cir. 1985). "The Securities Act and the Exchange Act permit the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." *Sec. & Exch. Comm'n v. Jammin Java Corp.*, No. 215CV08921SVWMRW, 2016 WL 6595133, at *7 (C.D. Cal. July 18, 2016) (internal quotations omitted). The Ninth Circuit uses a three part test to evaluate personal jurisdiction.

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205–06 (9th Cir. 2006).

### a.  Defendants' Purposefully Directed their False Statements at United States Investors

To establish the first prong of the Ninth Circuit's test, purposeful direction, a plaintiff must allege that defendants "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). Defendants' false statements satisfy all three prongs. First,

11

Defendants obviously issued their statements intentionally, and the Complaint alleges that they were intentionally false. Second, Defendants' statements to investors were expressly aimed at the United States. Defendants specifically timed their issuance of statements to maximize the impact of their statements on US investors. Defendants acknowledged as much on November 12, 2020, when they informed investors that they were rescheduling the issuance of their quarterly earnings from November 26 to November 25, in order to avoid overlapping with "a public Holiday in the United States of America", that is, Thanksgiving:

> the Management Board of CD PROJEKT S.A., with a registered office in Warsaw at Jagiellońska 74, hereby announces that the Q3 2020 consolidated financial statement, originally scheduled for publication on 26 November 2020, will instead be published on 25 November 2020.

> The change of the timing for the publication is related to a public holiday in the United States of America, i.e. November 26th.

Declaration of Jonathan Stern, Exhibit 1. (Hereafter all references to Ex. Refer to exhibits to the Declaration of Jonathan Stern unless otherwise specified).

Further, Defendants delayed the earnings call for that quarter until Monday November 30 to further accommodate Thanksgiving. To avoid doubt about whether this investor call targeted an American audience, Nielubowicz concluded by wishing "a very good Thanksgiving to all our American friends." Ex 2.

Prior to the COVID pandemic, CD Projekt participated in investor presentations physically within the US. According to CD Projekt's events calendar it conducted investor meetings from June 11 to June 13, 2019 in LA, and participated in a "roadshow" – referring to when executives visit multiple cities to promote their securities to investors – with Morgan Stanley in Boston and New York on June 24 through June 26, 2019, and another with Stifel in New York and Boston on September 24 through September 26, 2019, and on October 8 through 11, 2019. And even during the Covid pandemic, CD Projekt also participated in

Citi Bank's New York based GEM Conference for US investors from September 16 to 17, 2020. Exs.3 & 4. Citi is also a sponsor of CD Projekt's ADRs.

Finally, the Complaint alleges that Defendants' false statements harmed the Plaintiffs.

### b.    Plaintiffs' Claims Directly Arise out of Defendants' US Contacts

To satisfy the second prong of the personal jurisdiction test, "the claim must be one which arises out of or relates to the defendant's forum-related activities" *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 742 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 135 S. Ct. 1591, 191 L. Ed. 2d 511 (2015). The Ninth Circuit has referred to this test as the "but for" test. "Under the 'but for' test, a lawsuit arises out of a defendant's contacts with the forum state if a direct nexus exists between those contacts and the cause of action." *Id.* (internal quotations omitted). Here, the lawsuit against arises directly out of Defendants' false statements to US investors, that, as the previous section sets forth, were directed at the United States of America. Therefore, this action satisfies the second prong of the personal jurisdiction test.

### c.    Exercising Personal Jurisdiction Over Defendants is Fair and Reasonable

The Ninth Circuit considers seven factors in determining whether the exercise of personal jurisdiction would be fair and reasonable:

> (1) the extent of the defendant's purposeful interjection into the forum state, (2) the burden on the defendant in defending in the forum, (3) the extent of the conflict with the sovereignty of the defendant's state, (4) the forum state's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the controversy, (6) the importance of the forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum.

*Id.* The burden is on Defendants to present a "compelling case" that the exercise of personal jurisdiction would be unfair and unreasonable. *Id.* They

1   cannot meet that burden.

2       First, Defendants' contacts with the United States are extensive. CD

3   Projekt's largest market, constituting a majority of its sales, is in the United States.

4   Ex. 5. CD Projekt maintains an office in California. CD Projekt timed release of

5   both its earnings statement and conference call to avoid coinciding with

6   Thanksgiving, maximizing the impact its statements had on US investors. CD

7   Projekt has also participated in many roadshows courting US investors, and

8   Defendant Iwinski personally attended the E3 conference in Los Angeles in 2019

9   to promote CD Projekt and Cyberpunk 2077. Exs 3 & 5. These contacts support

10  the reasonableness of exercising personal jurisdiction. *See Freestream Aircraft*

11  *(Bermuda) Ltd. v. Aero L. Grp.*, 905 F.3d 597, 607 (9th Cir. 2018) (Exercise of

12  jurisdiction was reasonable where defendant attended conference on behalf of

13  company and regularly solicited business in the forum).

14      Second, the burden on Defendants of litigating in Los Angeles is minimal.

15  Defendants already regularly travel to the United States to solicit business and

16  investment and have a Los Angeles office. Moreover, "modern transportation

17  reduces the burden of travel for out-of-forum witnesses". *Corp. Inv. Bus. Brokers*

18  *v. Melcher*, 824 F.2d 786, 791 (9th Cir. 1987). In particular, "[c]ourts routinely

19  reject claims by foreign defendants that it would be too burdensome for them to

20  defend themselves outside their home country, particularly when those companies

21  'use technology and transportation to carry on the business relationship at

22  issue.'" *Artec Grp., Inc. v. Klimov*, No. 15-CV-03449-RMW, 2015 WL 9304063,

23  at *6 (N.D. Cal. Dec. 22, 2015) (*quoting Pandigital, Inc. v. DistriPartners B.V.*,

24  No. C 12-01588 CW, 2012 WL 6553998, at *4 (N.D. Cal. Dec. 14, 2012)).

25      Third, Defendants identify no conflict between this lawsuit and Polish

26  sovereignty. Courts in this circuit routinely find no conflict in a foreign country's

27  sovereignty in litigating securities fraud actions in the United States. *Vancouver*

28  *Alumni Asset Holdings Inc. v. Daimler AG*, No. CV1602942SJOKSX, 2017 WL

2378369, at *10 (C.D. Cal. May 31, 2017); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 66281, at *23 (N.D. Cal. Jan. 4, 2017). Defendants give no reason that this case is an outlier. Thus, the third factor supports exercise of jurisdiction.

Fourth, the United States has an interest in adjudicating claims of securities fraud against US persons. As Defendants note, "the United States has a clear and obvious domestic interest in protecting U.S. investors, and the federal court has an equally clear localized interest in enforcing federal securities laws." *Vancouver Alumni Asset Holdings Inc.*, 2017 WL 2378369, at *10. Defendants claim that this interest is diminished here because they did not register their securities here. But defendants cite no authority for that proposition, and undercutting Defendants' argument is the fact that they deliberately injected themselves into the forum by specifically soliciting US investors.

Fifth, the most efficient forum is ordinarily "site where the injury occurred and where evidence is located." *Pac. Atl. Trading Co. v. M/V Main Exp.*, 758 F.2d 1325, 1331 (9th Cir. 1985). The injury to Plaintiffs, and the class, occurred here. And while a considerable quantity of evidence is located in Poland, there is also evidence located here. The vast majority of evidence nowadays is digital, so that it is easily gathered from computer networks and exchanged electronically between the parties. *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998) (location of evidence "is no longer weighed heavily given the modern advances in communication and transportation"). Plaintiffs are located here, as is evidence of their trades. Therefore, this factor does not support denial of personal jurisdiction.

Sixth, "the United States has a clear and obvious domestic interest in protecting U.S. investors, and the federal court has an equally clear localized interest in enforcing federal securities laws." *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, No. CV1602942SJOKSX, 2017 WL 2378369, at *10 (C.D. Cal. May 31, 2017). Therefore this factor does not support denial of jurisdiction.

Finally, Defendants have not shown Poland to be a reasonable alternative forum. "Whether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable." *Corporate Inv. Business Brokers*, 824 F.2d at 791. In addition, while Defendants cite to a legal treatise for the proposition that Poland provides a remedy for securities fraud. What Defendants do not show is that this cause of action is actually available extraterritorially to non-Polish residents who purchased stock in the United States, or that it would be available to people who purchased ADRs, rather than purchasing company stock directly.

## 2. CD Projekt is Subject to General Jurisdiction

Because the of the constant and pervasive contacts between CD Projekt and the United States, the Court can exercise general jurisdiction over it. General jurisdiction over a corporation is appropriate "only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive as to render it essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (internal quotations omitted). In addition, "general jurisdiction is not strictly limited to a corporation's place of incorporation or principal place of business." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1021 (9th Cir. 2017). Defendants' contacts with the United States are so extensive that they warrant exercise of general jurisdiction. As of July 2021 70% of CD Projekt's sales revenues came from North America. Ex. 5. Given the relative size of the US market compared to Mexico and Canada, the US accounts for a majority or near majority of CD Projekt's sales. CD Projekt heavily promoted Cyberpunk in the United States, premiering gameplay footage at the E3 conference. Further indicating the importance of the US to CD Projekt's business, CD Projekt hired Keanu Reeves to be the face of Cyberpunk 2077, with Reeves contributing voice and motion capture performances for the game. As set forth above, Defendants also promoted CD Projekt's stock extensively in the United States. Given these

16

contacts, CD Projekt is truly at home in the United States.

### 3.    The Individual Defendants are Subject to Jurisdiction as Control People of CD Projekt

Courts have found that where personal jurisdiction exists over a corporation for violations of Section 10 of the Securities Exchange Act, personal jurisdiction also exists for control persons of that corporation for violation of Section 20(a). *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 7347, 2020 WL 4905093 (N.D. Cal. Aug. 20, 2020). Because the individual defendants do not contest that they are control persons of CD Projekt, personal jurisdiction over them exists here.

### B.    The Complaint Alleges that The Transactions Are Within the Territorial Scope of the Exchange Act

#### 1.    Plaintiffs' Transactions Are Within the Scope of the Securities Exchange Act Under *Morrison*

Defendants' claim that the Complaint fails to allege "domestic transactions" within the meaning of the Securities Exchange Act is meritless. The Supreme Court has held that Section 10(b) of the Securities Exchange Act applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266–67 (2010). To determine whether a transaction is domestic, this Circuit adopted the "irrevocable liability" test. *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 948 (9th Cir. 2018). This test was first articulated by the Second Circuit in *Absolute Activist*, which held that "to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange …a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). A broker's location, while not determinative, is relevant "to the extent that the broker carries out tasks that irrevocably bind the parties to buy or sell securities." *Absolute Activist*, 677 F.3d at 68. In *Atlantica*, the US plaintiffs

17

alleged facts suggesting they incurred liability in the US by pleading they sent transaction requests to their U.S.-based broker, which were then transmitted to the broker's U.S. broker in New York, and the transaction was completed in UBS's back office, whose location was not specified and might well have been foreign. *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 560 (S.D.N.Y. 2014) Without determining whether any of these steps incurred irrevocable liability, the *Atlantica* court nonetheless held that the plaintiff had pleaded enough for a motion to dismiss. Here, the Complaint alleges that all plaintiffs were US residents, purchased ADRs or F Shares of CD Projekt through US brokers, that the trades were carried out over the OTC Pink, which is also located in the United States, and that the ADRs were created and held by, domestic entities in New York. ¶¶7-9, 11. This easily suggests that Plaintiffs incurred irrevocable liability in the US.

Defendants point to no facts undercutting a plausible inference that Plaintiffs' transactions were domestic. Instead they point to facts that the court found sufficient (but never necessary) to plead a domestic transaction *Toshiba*. *Stoyas v. Toshiba Corp.*, 424 F. Supp. 3d 821, 827 (C.D. Cal. 2020). In some cases, Defendants point to facts alleged in *Toshiba* that the Complaint also alleges. For instance, the fact that the depositary banks issued their ADRs in New York, ¶11, and that Plaintiffs' brokers, Charles Schwab, JP Morgan, and Vanguard are all in New York, ¶¶7-9. In other cases, Defendants point to pleading in *Toshiba* that was slightly different than the claims here, but never explain why the distinctions matter. For instance, plaintiffs in *Toshiba* alleged that the purchase orders and trade confirmations were routed through OTC Link's servers. Here, the Complaint alleges that the transactions were conducted through OTC Pink. But Defendants give no reason to question the plausible inference that transactions conducted through OTC Pink would have had their purchase orders and trade confirmations routed through OTC Pink's servers. In short, Defendants do nothing

18

to undercut the plausible inference that irrevocable liability was transferred in New York.

### 2.      Defendants' Conduct Was In Connection with the ADRs and Shares

Defendants claim that the Complaint fails to establish that Defendants' conduct was "in connection" with Plaintiffs' and class members' purchases of ADRs and common stock. Defendants attempt to analogize the Complaint to the allegations that the Ninth Circuit found inadequate in *Toshiba*. As an initial matter, Defendants' argument has no merit as applied to CD Projekt's F- shares because, as Defendants themselves note, F-shares are merely common stock of CD Projekt that were assigned a new ticker symbol so that they could trade on the OTC. Def. Br. p. 5. Defendants indisputably issued their own common stock and there is no real question that Defendants' misstatements were made "in connection" with transactions in CD Projekt common stock.

As to the ADRs, the reasons the Ninth Circuit found the *Toshiba* Complaint inadequate are inapplicable. First, in *Toshiba*, the Court noted plaintiffs pled nothing about the ADRs, instead alleging that plaintiff "acquired Toshiba common stock during the Class Period through the purchase on March 23, 2015 of 36,000 shares of [Toshiba ADRs] in the United States". *Toshiba* 896 F.3d at 951. Here, unlike *Toshiba*, the Complaint identifies the depositories and where they are located, where investors could tender their ADRs in exchange for common stock, and where the ADRs traded. ¶11. This is sufficient to establish that Defendants' statements were "in connection" with the purchases of common stock.

Second, while the Complaint does not allege that Defendants played a role in the creation of the ADRs, *Toshiba* never stated that this was the only way to show Defendants' statements were "in connection with" a domestic purchase of CD Projekt securities. And here, as set forth in section A.1.a above, Defendants' statements were in connection with US ADR and F Share purchases because

Defendants deliberately timed their statements to maximize their impact on US investors. A defendant need not be connected to the issuance of a security to make misstatements in connection with the security, as stock promoters have been found liable under the Exchange Act. *S.E.C. v. Abellan*, 674 F. Supp. 2d 1213, 1219 (W.D. Wash. 2009).

### C.    Dismissal on a Forum Non Conveniens Basis is Unwarranted
#### 1.    Standard for Forum Non Conveniens Dismissal

In the Ninth Circuit, the "party moving to dismiss on grounds of *forum non conveniens* must show: (1) the existence of an adequate alternative forum, and (2) that the balance of private and public interest factors favors dismissal." *Lockman Found. v. Evangelical All. Mission*, 930 F.2d 764, 767 (9th Cir. 1991). "[T]he doctrine of *forum non conveniens* is 'an exceptional tool to be employed sparingly.'" *Gutierrez v. Advanced Med. Optics, Inc.*, 640 F.3d 1025, 1029 (9th Cir. 2011). This Court has found that "there is usually a 'strong presumption in favor of honoring the plaintiff's choice of forum, a foreign plaintiff's choice is afforded less deference.'" *Weisel Partners LLC v. BNP Paribas*, No. C 07-6198 MHP, 2008 WL 3977887, at *8 (N.D. Cal. Aug. 26, 2008); *see also Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1449 (9th Cir. 1990) ("great deference is due plaintiffs because a showing of convenience by a party who has sued in his home forum will usually outweigh the inconvenience the defendant may have shown."). A forum is adequate where (1) "the defendant is amenable to service of process in the foreign forum" ***and*** (2) the foreign forum must offer a "***practical*** remedy for the plaintiff's complained of wrong." *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1143–44 (9th Cir. 2001) (emphasis added). However, "where the remedy provided by the alternative forum ... is so clearly inadequate or unsatisfactory, that it is no remedy at all," the forum is inadequate. *Id.*

"A plaintiff's choice of forum will not be disturbed unless the 'private

interest' and the 'public interest' factors *strongly* favor trial in a foreign country."
*Weisel Partners*, 2008 WL 3977887 at * 11 (emphasis added). The private interest
factors are: "(1) the residence of the parties and the witnesses; (2) the forum's
convenience to the litigants; (3) access to physical evidence and other sources of
proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of
bringing witnesses to trial; (6) the enforceability of the judgment; and (7) 'all
other practical problems that make trial of a case easy, expeditious and
inexpensive.'" *Lueck*, 236 F.3d at 1145. Public interest factors are: "(1) the local
interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the
burden on local courts and juries, (4) congestion in the court, and (5) the costs of
resolving a dispute unrelated to a particular forum" *Id.* at 1147.

### 2. Defendants Have not Shown Poland to be Adequate.

To obtain dismissal on *forum non conveniens* grounds, Defendants must
identify an adequate alternative forum. "The foreign forum must provide the
plaintiff with some remedy for his wrong in order for the alternative forum to be
adequate. As with the other requirements of a forum non conveniens dismissal, the
burden of showing the existence of an adequate alternative forum is the
defendant's." *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1143 (9th Cir. 2001).
Defendants cite to a legal treatise for the proposition that Poland provides a
remedy for securities fraud. What Defendants do not show is that this cause of
action is available in Poland to people who purchased stock in the United States,
or that it would be available to people who purchased ADRs, rather than
purchasing company stock directly. Defendants' citation to several non securities
fraud cases where courts have found Poland to be adequate does nothing to
support their assertion that Poland is adequate as a forum to adjudicate securities
fraud cases brought by persons who bought US based f-shares or ADRs.

### 3. Balancing of the Private and Public Interest Factors Favors the U.S.

Since Defendants did not demonstrate that Poland is an adequate forum, The Court need consider the public and private factors. Nevertheless, the balance of those factors weighs against dismissal. "[A] plaintiff's choice of forum will not be disturbed unless the 'private interest' and the 'public interest' factors *strongly* favor trial in a foreign country." *Weisel Partners*, 2008 WL 3977887 at * 11 (emphasis added). Defendants failed to meet that high burden.

### a.    Private Interest Factors

The private interest factors in the Ninth Circuit are: "(1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) 'all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Lueck*, 236 F.3d at 1145. The balance of these factors favors denial of Defendants' motion.

The location of parties and witnesses and convenience to the litigants favor the US. Plaintiffs are in the US. Lead Plaintiff, who does not speak Polish, would find it difficult and burdensome to travel to Poland, retain a Polish law firm and participate in a lawsuit in Poland, and would also be burdened by the practical absence of securities class actions in Poland for securities fraud cases. The source Defendants cite states that in most cases securities class actions cannot be certified in Poland. *Mariola Lemonnier, Poland: Investor Protection in the Polish Capital Market – Selected Issues, Global Securities Litigation And Enforcement* 534 (Pierre-Henri Conac & Martin Gelter eds., 2019). While Defendants claim many witnesses are located in Poland, there are also several witnesses in the US, namely the Plaintiffs. And though Defendants assert that "most (if not all) the important documentary evidence and current and former CD Projekt employees likely to be material witnesses are all located in Poland", this is insufficient to meet their burden. The Ninth Circuit has held that District Courts should "examine[] the

22

materiality and importance of the anticipated witnesses' testimony and then determine[] their accessibility and convenience to the forum." *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1335–36 (9th Cir. 1984). Moreover, "the increased speed and ease of travel and communication" has rendered the location of witnesses far less of a persuasive reason to dismiss on *forum non conveniens* grounds. *Id.* Access to physical evidence does not favor either side, because the information is entirely electronic and there is no burden to producing electronic evidence in either setting. Ability to compel witnesses to trial favors neither side because this Court can compel CD Projekt to make available witnesses who are employees, officers, or directors to testify in the US. Enforceability of the judgment is not a concern because CD Projekt does significant business with the US. As a practical matter, re-filing this case in Poland will be inefficient, and require the hiring of new attorneys and re-filing of pleadings. Therefore, the balance of private factors favors denial of *forum non conveniens* dismissal.

### b.    Public Interest Factors

The Ninth Circuit considers the following public interest factors to decide whether an action should be dismissed on the grounds of *forum non conveniens*: "(1) the local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular forum" *Lueck*, 236 F.3d at 1147.

This Court has a strong interest in this suit. "There exists a strong local and national interest in enforcing the securities laws of this country in order to maintain the integrity of the markets. *Lynx Ventures LP v. Canadian Imperial Bank of Com.*, No. CV 99-07160RSWLMANX, 2000 WL 33223384, at *2 (C.D. Cal. Apr. 18, 2000) (internal quotations omitted). This claim arises under the federal securities laws and affects shareholders who traded CD Projekt shares and ADRs on a U.S. market. Defendants cite no case of a court dismissing on *forum*

*non conveniens* grounds where a plaintiff purchased in the US. Defendants cite *Goldcorp*¸ but that court emphasized that "Goldcorp shares do not trade on stock exchanges (nor are they sold over the counter) in the United States." *Howe v. Goldcorp Invs., Ltd.*, 946 F.2d 944, 945 (1st Cir. 1991). None of Defendants' other cases relate to securities at all. This Court's familiarity with the governing law favors the US. This Court has heard and presided over many securities cases. According to the Stanford Law School Securities Class Action Clearinghouse, which tracks US securities class actions, there have been at least 200 securities fraud class actions filed in the Central District of California in the last 10 years. *Available at* http://securities.stanford.edu/filings.html (last visited on October 3, 2021). Defendants provided no case of Polish courts interpreting US securities laws. The remaining factors - the burden on the courts and juries, congestion of the courts, and costs of resolving the dispute also point towards the U.S. as the best forum to litigate this action. The action has already commenced in the U.S. and it would be wasteful to end the litigation here and discard the efforts the Court has already put into this case when there has been no indication that it would be harmful to the court, litigants, or taxpayers for this case to continue here. It is well worth the U.S.'s while to litigate this action in this Court because the laws in question are designed to protect the interests of US investors.

## D.    The Complaint Alleges the Elements of Securities Fraud

Courts assess Rule 12(b)(6) motions by considering the complaint in its entirety, "accept[ing] all factual allegations . . . as true" and construing them in the light most favorable to plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). A complaint should not be dismissed if it contains a "sufficient factual matter [that], accepted as true, 'state[s] a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must be mindful that "a district court ruling on a motion to dismiss is not sitting as a trier of fact" and "[a] well-pleaded complaint may proceed even if it strikes a

savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Claims asserted under Section 10(b) of the Securities Exchange Act must plead six elements: a misrepresentation or omission of material fact, scienter, a connection with the purchase of sale of a security, reliance, economic loss, and loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Defendants only challenge falsity and scienter.

### 1.    The Complaint Alleges Falsity

To plead falsity under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement [or omission] is misleading." 15 U.S.C. § 78u-4(b)(1)(B). The allegations must identify who made the allegedly misleading statements and what statements were misleading, state where and when the statements were made, and explain why the statements were misleading. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). The Complaint does exactly that.

### a.    Defendants' Statements Were False

Defendants claim that "many" of the challenged statements were "unquestionably true when made." Defendants claim that the statements that the game was "complete", "playable" and "releasable" were true, statements that Defendants made on September 4 and October 28, 2020. In support, Defendants point out that the Complaint does nothing to contradict their statement that "[t]he quests, the cutscenes, the skills and items; all the adventures [the game] has to offer - it's all there." Def. Dec. Ex. R. But Defendants fail to note that this statement *was never cited as false in the complaint.* Rather, the complaint alleges that the claims that the game was "complete" "playable" and "releasable" were false because the game was so rife with bugs that it was, according to the New York Times, "virtually unplayable: rife with errors, populated by characters running on barely functional artificial intelligence, and largely incompatible with

the older gaming consoles meant to support it" ¶49. Further supporting the allegation that the statement that the game was "complete and playable" was false is the fact that at a video meeting including CD Projekt's board and staff, an employee "asked the board why it had said in January that the game was 'complete and playable' when it wasn't true, to which the board answered that it would take responsibility." ¶55. Rather than take responsibility, however, Defendants now contradict what the board acknowledged at that staff meeting, that their statement that the game was playable was false.

Defendants argue that because, according to their statements, Microsoft and Sony "certified" Cyberpunk for release, it proves that defendants' statements that Cyberpunk was "complete and playable" and "releasable" were true. This argument is invalid for two reasons. First, it improperly relies on documents outside of the complaint for truth. *In re ECOtality, Inc. Sec. Litig.*, No. 13-03791-SC, 2014 WL 4634280, at *3 (N.D. Cal. Sept. 16, 2014) ("The Court takes judicial notice of [documents incorporated by reference in the complaint], but does not necessarily assume their truth."); *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1029 (C.D. Cal. 2015) (Defendant "clearly seeks to have the court take judicial notice of the truth of the facts stated in the various press releases and news articles. This the court cannot do."). The Ninth Circuit has warned against exploiting the judicial notice "procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Second, even if the Court *did* take CD Projekt's claim that Sony and Microsoft certified the game as true, then the Court should also take notice that certification does not mean what Defendants claim. As set forth in an article from screenrant.com (Ex 7), certification does not ensure that a game is playable or functioning properly, it merely ensures that the game would not cause damage to a customer's gaming console, not that the game actually works. Finally, Defendant Nowakowski, on the

December 14 call, responded to a question about why Sony and Microsoft certified the game with the following: "In terms of the certification process and the third parties – this is definitely on our side. I can only assume that they trusted that we're going to fix things upon release, and that obviously did not come together exactly as we had planned." Ex. 8. That is, Nowakowski admitted that the game was *not* ready for release at the time that it was certified, and only obtained a certification because Microsoft and Sony expected them to finish the game in the time between certification and release, and CD Projekt failed to follow through. Nowakowski's statement not only undercuts Defendants' argument that certification meant that their statements were true, it is an admission that Defendants' claim that the game was ready at the time of certification was false.

Defendants' assertion that the level of bugs present did not make the game incomplete or unplayable is undercut by the reaction of Sony and Microsoft to the game's defects. The fact that Sony and Microsoft would take the unusual step of offering full refunds for the game, that Sony would suspend sales of the game, that Microsoft would offer a warning label about the game's performance, and that the New York Times would call the game unplayable, all support a plausible inference that Defendants' statement that the game was complete and playable was materially misleading. ¶¶53-54, 64.

### b.   Defendants' Statements Were Not Puffery

Defendants argue that several misstatements are puffery. But Defendants fail to acknowledge that puffery depends on context. "[E]ven 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) *quoting Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996). Defendants do not and cannot explain why the challenged statements are puffery in context, because in context, the challenged statements

27

are not puffery. Defendants made the statements in context of announcing multiple delays with the release of Cyberpunk. First, on January 16, 2020, Iwinski stated the game was "complete and playable" immediately after stating that the game was delayed from April to September. ¶39. This statement reassured investors who might otherwise have inferred from the delay that Cyberpunk was incomplete or had serious problems. Similarly, on October 28, Kicinski announced another delay but reassured investors that "the game is releasable on the 19th", reassuring investors that the delay did not mean that they were having any difficulties creating a playable game. ¶42. Defendants statement that "there is no problem with Xbox or Playstation 4" was, again, directly in response to rumors that there were problems with the Xbox and Playstation 4. ¶43. Kicinski's statement on November 30 that "the game performs great on every console" was directly in response to an analyst's question about the game's performance on PS4, "I think it's been said that maybe [Cyberpunk] wasn't working quite as well on PS4; have we seen any gameplay on PS4? Could you give us a bit of an update on how it performs on PS4?" ¶45, Ex. 2. Defendants would have the Court hold that their direct responses to questions from investment analysts were mere puffery. But no reasonable investor would interpret those statements that way.

Defendants' reliance on *Electronic Arts* is without merit because that case is easily distinguishable. In *Electronic Arts*, defendants were planning on releasing "approximately twenty-six games, including a 'slate of games' available on next-generation gaming consoles." *Kelly v. Elec. Arts, Inc.*, 71 F. Supp. 3d 1061, 1063 (N.D. Cal. 2014). Among them was a game called Battlefield 4. Defendants made several vague statements of optimism about the company's ability *overall* to bring that "slate" of games to next generation consoles. Plaintiffs' suit, however, related only to Battlefield 4. And the statements were not straightforward assurances, in response to concerns about delays, that Battlefield 4 was ready for launch, but vague statements that their transition had been "de-risked", or that compared

Battlefield 4 to a world series pitcher. Here, by contrast, CD Projekt had one game they were readying for release, and they made specific assurances that the game was complete playable when in reality the game was not.

### c.   To the Extent that Any of Defendants' Statements Were Statements of Opinion, they are Actionable Under *Omnicare*

Defendants' assertion that several of their statements are inactionable opinion statements under *Omnicare* is meritless. First, only a minority of Defendants' statements are couched as opinions. ¶¶45-6. Second, even where *Omnicare* does apply, it allows for a broader range of allegations to establish falsity than Defendants acknowledge. "*Omnicare* establishes three different standards for pleading falsity of opinion statements. First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue. Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that 'the supporting fact [the speaker] supplied [is] untrue.' Third, when a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the issuer's opinion ... whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017), *quoting Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015). Defendants' statements are false under all three prongs of the *Omnicare* test.

The first opinion statement was Kicinski's claim on November 30 that "we believe that the game performs great on every platform." This was a claim about the then present state of Cyberpunk, not a claim about what Defendants hoped to or believed they could achieve before launch. The Complaint alleges facts

supporting the allegation that Defendants did not actually believe this statement when it was made because, as Defendant Iwinski admitted, on December 14, CD Projekt withheld review copies on last generation consoles because they were attempting to upgrade them to remove the very performance defects that they claimed on November 30 did not exist. ¶65. Second, the statement omits key facts going to the basis of Defendants' opinions: that they had performed inadequate defect testing on the last generation versions of the console versions of the game due to Covid 19, that they "ignored signals" that the game was not ready, and that they were concealing the game from reviewers due to these problems. Finally, the failure to disclose the signals that Defendants themselves admitted they ignored, failure to disclose the inadequate bug testing, and the concealment from reviewers rendered their statements misleading under the third prong of *Omnicare*.

### d.    Because Defendants did not Register Their Securities in the United States, The Safe Harbor Does not Apply

Defendants invoke the PSLRA's "safe harbor" for forward looking statements, but this reliance is inappropriate because Defendants did not register securities with the SEC. The PSLRA safe harbor for forward looking statements appears at 15 U.S.C. § 78u-5. But subsection (a) of that section restricts the applicability of the safe harbor to securities that are registered with the SEC.

This section shall apply only to a forward-looking statement made by--

**(1)** an issuer that, at the time that the statement is made, is subject to the reporting requirements of section 78m(a) of this title or section 78*o*(d) of this title;

**(2)** a person acting on behalf of such issuer;

**(3)** an outside reviewer retained by such issuer making a statement on behalf of such issuer; or

**(4)** an underwriter, with respect to information provided by such issuer or information derived from information provided by such issuer.

15 U.S.C. § 78u-5(a)

Section 78m(a) sets forth the requirement for issuers that are registered with the SEC to file annual and quarterly reports, and 78o pertains to brokers and dealers. As Defendants have noted repeatedly in their motion to dismiss for lack of personal jurisdiction, CD Projekt is *not* registered with the SEC or subject to the reporting requirements of Section 78m(a).

Moreover, even if the safe harbor did apply, Defendants have not shown that they met the requirements of it. To receive the benefit of the safe harbor, a statement must either be "identified as such and accompanied by meaningful cautionary statements" or be made without actual knowledge of its falsity. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010). Defendants omit from their discussion of forward looking statements any mention of the requirements that under the first prong of the safe harbor any forward looking statement must be *identified as forward looking*, and the reason why defendants omit this is obvious – none of the statements Defendants claim are subject to the safe harbor was identified as forward looking. See Exs 2 & 9.

Further, Defendants' claim that the statements were accompanied by "meaningful cautionary language" is simply untrue for most of the statements. The statements in Paragraphs 41 and 46 of the complaint were made during conference calls, and the transcripts of the calls reveal *no* meaningful cautionary language. Ex. 2 & 9. Therefore, the safe harbor does not apply to their statements.

## 2.  The Complaint Alleges Scienter

Plaintiff alleges facts raising a strong inference of scienter, which not only includes knowledge, "but also deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). The "inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 322–23. A "strong inference" is raised when "a

31

reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference" of nonfraudulent intent. *Id.* at 310. The scienter inference "need not be irrefutable … or even the most plausible," and no "smoking-gun" is required. *Id.* at 324–26. "'[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA. *In re Capstone Turbine Corp. Sec. Litig.*, No. CV158914DMGRAOX, 2018 WL 836274, at *5 (C.D. Cal. Feb. 9, 2018) (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)).

### a.  The Complaint Establishes a Plausible Motive

The Supreme Court and Ninth Circuit held that motive allegations can support an inference of scienter, but are not necessary to such a finding. *Tellabs*, 551 U.S. at 325 ("motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, [but] the absence of a motive allegation is not fatal"); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1182 (9th Cir. 2009). The facts here create a plausible motive for the fraud. Defendants had not released a new product since 2015. ¶26. They delayed the release of Cyberpunk multiple times and faced pressure to release the game, earn substantial revenues, and book a profit. ¶55. If they had admitted that Cyberpunk 2077 was not only incomplete but not even close to being in a playable state, they would not have been able to release the game and reap the still considerable profits that they obtained even though the game was unfinished.

Defendants argue that this case is analogous to facts in the recent Ninth Circuit *Endologix* decision. But those facts are very different from the ones here. In *Endologix*, plaintiffs alleged that defendants failed to disclose to the public the fact that their then ongoing FDA trial was doomed to failure. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020). The Ninth Circuit found a lack of scienter because, among other reasons, in the absence of stock sales, there was

32

simply no rational motive to continue the FDA trial and claim that it had a chance of success if it was doomed to failure, because it would make far more sense to simply terminate the trial and move on to something else. But the difference between *Endologix* and this case is that in *Endologix*, without FDA approval, defendants were unable to release any product at all, and so continuing a trial that was doomed to failure was simply a waste of money. Here, the situation is different. By telling the public that they were releasing a polished and playable game, but instead releasing a fundamentally broken game, Defendants were still able to make millions of sales, albeit less than if they had managed to deliver.

Defendants also argue that the alleged fraud makes no sense because defendants were "the biggest victims of their own purported fraud." But this confuses two things. Defendants are guilty of both mismanagement, in that they failed to produce a working game, and fraud, in that they lied and said that the game *was* working even though they knew they had failed. Defendants' mismanagement cost them a great amount of money when it was exposed. But their fraud allowed them to sell a game that fundamentally did not work and therefore allowed them to make far more money than they would have had they come clean about their mismanagement and admitted that the game did not work.

### b.     for the Court Should Not Disregard Media Reports

The Complaint cites a Bloomberg article to support a strong inference of scienter. Defendants argue that the allegations drawn from the Bloomberg article should be disregarded because "the allegations have not been independently verified by Plaintiffs' counsel." Defendants' argument relies entirely on a single case that held that a complaint failed to comply with the investigation requirements of Rule 11(b) by relying *entirely* on a single SEC complaint. *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008). Here, by contrast, the Complaint cites to several other sources, including an article in the New York Times, ¶¶49, 64, Defendants own statements on conference calls, ¶65,

68, 69, a leaked video from CD Projekt showing glitches contained in the game, ¶38, among other sources. This is sufficient. *Dean v. China Agritech, Inc.*, No. CV 11-01331-RGK PJWX, 2011 WL 5148598, at *4 (C.D. Cal. Oct. 27, 2011) (Counsel corroborating facts in short-seller report sufficient for finding of scienter). *See also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000). ("To the extent that a newspaper article corroborates plaintiff's own investigation and provides detailed factual allegations, it can—at least in combination with plaintiff's investigative efforts—be a reasonable source of information and belief allegations"), c*iting, Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982) ("Reliance on an article in The Wall Street Journal is not reliance on an insubstantial or meaningless investigation. Plaintiffs and their attorneys need not make further expenditures to prove independently that which may be read with some confidence of truthfulness and accuracy in a respected financial journal.").

Second, Defendants claim the Bloomberg Article should be disregarded because it fails to describe its anonymous sources with sufficient particularity. But in the cases Defendants rely on, *plaintiffs* proffered confidential witnesses that their own investigators interviewed, not confidential witness allegations derived from reliable media sources such as Bloomberg. Courts have not required detailed descriptions about anonymous source backgrounds when they appear in detailed media reports. *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 6482014, at *11 (N.D. Cal. Nov. 4, 2020); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) ("if the newspaper article includes numerous factual particulars and is based on an independent investigative effort, it is a source that may be credited in determining whether plaintiffs have alleged facts sufficient to raise a strong inference of scienter.").

Defendants also completely ignore the December 18, 2020 article on Bloomberg.com, and for good reason, because it provides direct evidence of

34

Defendants' scienter. According to the December 18 article, CD Projekt's board held a video meeting with frustrated staffers, and provided details of that meeting based on two people who were present on the call. ¶55. On that call, "[o]ne employee asked the board why it had said in January that the game was 'complete and playable' when that wasn't true, to which the board answered that it would take responsibility." *Id.* This shows that the board admitted to its own employees that they were aware that their public statements were false.

### c.     The Complaint Alleges Obvious Defects that Support a Strong Inference of Scienter

While Defendants concede that they were aware of bugs in the last-generation versions of Cyberpunk, they claim that the Complaint does nothing to show that the bugs were so severe as to render the games unplayable on last generation consoles. That is untrue. First, the complaint points out that Defendants deliberately withheld those versions of the games from reviewers so that reviewers would not report on them to the public and thereby undercut their narrative that the game was playable and complete. Defendants attempt to explain this away by saying that Defendants were trying to update the game at the last minute, and were hoping to fix the game in the time between when it would have gone to reviewers and the date of release. But this shows precisely why Defendants' statements were misleading – they repeatedly claimed that the game was already complete and playable. In reality the game was so unplayable they could not show it to reviewers. The fact that they were hoping to fix the game in the eleventh hour does not render their statements any less misleading.

Further supporting the allegation that the glitches were widely known within the company was the bug reel that CD Projekt employees compiled and circulated. Defendants argue that there are no allegations to show when the bugs were found or that the bugs were not fixed before launch. But this is untrue. The reel was called "ElBuggado 2020" – indicating that the bug reel was assembled in

35

2020, that is, during the class period, and second, as set forth in the Complaint, many of the bugs shown in the game *do* mirror bugs that players encountered in the finished product. This is direct evidence that CD Projekt was aware of serious bugs during the class period, lied about them, and failed to fix them.

### d.     The Complaint Identifies Red Flags that Support Scienter

As the Complaint states, Kicinski admitted that he and the board ignored red flags that revealed that Cyberpunk 2077 was not ready for release at the time that they assured investors that it was: "After 3 delays, we as the Management Board were too focused on releasing the game. we ignored the signals about the need for additional time to refine the game on the last-gen consoles. The Ninth Circuit has held that ignoring "red flags" or "alarm signals" supports a finding of scienter. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000); *see also Reese v. Malone*, 747 F.3d 557, 571 (9th Cir. 2014), (ignoring red flags creates a strong inference of scienter); *In re New Century*, 588 F. Supp. 2d 1206, 1234 (C.D. Cal. 2008) (failure to correct statement in face of red flags creates a strong inference of scienter). Defendants' admission that the Management Board ignored red flags that Cyberpunk 2077 was not complete and playable at the same time that they reassured investors that it was is strong evidence of scienter.

Defendants' argument that "Mr. Kiciński's statement amounts only to an admission that the Company misjudged how much time should be spent optimizing the current generation consoles" misconstrues the nature of Defendants' misstatements and why Kiciński's admission showed his own scienter. Defendants claimed, during the class period, that the game was already ready for current generation consoles. Kiciński's statement admits that Defendants knew that the game was still unfinished when they assured investors that the game *was* finished, but Defendants hoped to cover up their misstatements by simply getting the game ready in the time remaining. Moreover, even as to the issue of

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS – Case No. 2:20-cv-11627-FMO-RAO

whether they could finish the game within the time allotted, Kiciński did not merely say that management misjudged whether they had enough time, but that they ignored signs that they did not have enough time. That is the difference between mere bad business judgment and deliberate recklessness.

Next, defendants argue that ignoring red flags did not constitute "an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021). But this ignores that numerous courts have held that ignoring red flags that their statements are false is exactly the sort of thing that constitutes deliberate recklessness. *Howard*, 228 F.3d at 1064; *Reese*, 747 F.3d at 571; *In re New Century*, 588 F. Supp. At 1234

### e.    The Core Operations Doctrine Supports a Strong Inference of Scienter

Further supporting a strong inference of scienter is the core operations doctrine. The core operations doctrine is the principle "that it may be inferred that facts critical to a business's 'core operations' or important transactions are known to key company officers." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 781 (9th Cir. 2008). It is well settled that the core operations inference can support a strong inference of scienter in conjunction with other facts forming a holistic analysis of scienter. In addition, "in some unusual circumstances, the core operations inference, without more, may raise the strong inference required by the PSLRA." *Id.* at 785. Finally, "[a]llegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." For instance, a complaint pled a strong inference of scienter where

"plaintiffs relied in part on 'specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database' to support a strong inference of scienter. The complaint … relied on specific and particular accusations about the role played by the defendants in managing the company, including specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements." *Id.* In another example, a complaint produced a strong inference of scienter because "among other things, the CEO of the defendant company was quoted as saying: 'All of our information is on one database. We know exactly how much we have sold in the last hour around the world,' a specific and detailed statement about defendants' actual knowledge."

Here, the production of Cyberpunk 2077 was a core operation of CD Projekt. Since 2015, when CD Projekt completed The Witcher 3, CD Projekt devoted ***substantially all of its resources*** to Cyberpunk 2077. ¶¶26. As Defendants note, "Cyberpunk 2077 is the biggest and most ambitious project" CD Projekt has ever undertaken. Def. Br. p. 8. And Defendants expressed personal knowledge of the bugs, with Defendant Kicinski stating that Defendants were "aware of all of the bugs". ¶69. These facts, taken together, create a strong inference of scienter. Defendants' argument that the core operation inference fails because Defendants were not themselves addressing specific glitches entirely misses the point. Defendants were in charge of a company that was almost entirely devoted to preparing one game for launch, Defendants spoke repeatedly and knowledgeably on earnings calls discussing the progress in completing the game and making it playable, and Defendants determined the timing of the release of that game based, presumably, on the progress that the company was achieving in correcting those glitches. If they were not monitoring the state of those glitches they had no business running their company, and certainly acted recklessly when they assured investors that Cyberpunk was completed and fully playable.

Defendants also argue that CD Projekt was working on other projects during the class period, but point to no allegation in the complaint nor any judicially noticeable source to establish that those other projects had any significant scope.

### f.   Defendants' Fake Promotional Video Supports a Strong Inference of Scienter

CD Projekt showed a video of supposed gameplay footage of Cyberpunk 2077 during the E3 conference in 2018. The reality is, this video was entirely faked, showing to what amounted to a computer graphics animated movie and passing it off as a recording of an actual game being played in order to misrepresent the progress they had made in making a functional game. This supports scienter because it shows Defendants' willingness to lie. Defendants claim that pre-class period conduct is per se irrelevant to Defendants' state of mind during the class period. To make this argument, they wholly misrepresent the District Court's decision in *Zelman*. *Zelman* stated that "proposed class period dates function only to define the plaintiff class, not to restrict the universe of relevant or actionable facts in this case" and went on to state that "[i]f misstatements alleged before the class period are relevant to her case, then facts indicating the contemporaneous state of mind of the individuals making those alleged misstatements are as well." *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal. 2005). *Zelman* rejected the very argument that Defendants make here. Defendants also argue that the 2018 video was not misleading because it "was never advertised as a final rendering of the game, and contains numerous warnings that the game was in development and that the graphics and gameplay depicted were aspirational and subject to change." Def. Br. p. 39. The problem with this argument is that the video did not show the graphics or gameplay of the game in progress *at all*¸ but rather what amounts to a computer animation that Defendants attempted to pass off as in-progress gameplay. Although investors would not have taken this video to be representative of the final product that CD

Projekt would produce, investors did understand it to represent CD Projekt's progress. And in that they were deceived.

### g.   A Holistic Examination of the Complaint Supports a Strong Inference of Scienter

Viewed holistically, the facts set forth in the complaint give rise to a strong inference of scienter. Since 2015, Defendants devoted nearly all of CD Projekt's resources to developing Cyberpunk 2077. They also devoted enormous efforts to hyping up the game, even if it meant producing misleading materials such as the 2018 video at E3. In the beginning of 2020, Cyberpunk was still far from ready, even though the company was facing an April deadline for release. Rather than admit that the game was unfinished and potentially undercut the hype they had built, CD Projekt assured the public that the game was finished and merely being polished. They repeated that false claim throughout the class period, and ignored clear signals that the game was not ready. As the launch approached, they concealed the flaws in the last generation console version of the game by withholding it from reviewers. This allowed them to launch an incomplete game and sell millions of copies. Defendants provided no alternative explanation that is more likely than the obvious one, that Defendants deliberately or recklessly misled investors. Defendants cannot explain why they created a fake video to promote the game, why they ignored red flags, or why they withheld the game from reviewers. For this reason, the Complaint properly alleges scienter.

### E.   The Complaint Alleges Control Person Liability

The motion to dismiss does not challenge that the Individual Defendants are control persons of CD Projekt. Therefore, because the Complaint successfully pleads a primary violation, it also pleads control person liability.

## IV.   Conclusion

For the foregoing reasons, the motion to dismiss should be denied. If it is granted, Plaintiffs seek leave to amend.

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS – Case No. 2:20-cv-11627-FMO-RAO

Dated: October 4, 2021

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Jonathan Stern
Jonathan Stern (*pro hac vice*)
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for the Class*

41